Syllabus.

No. 2324.

W. H. Roe *v.* The State.

1. Practice—Exception—Charge of the Court.—Objections to the charge of the court, when raised for the first time by the motion for new trial, or on appeal, will not be considered by this court unless there was a material misdirection of the jury as to the law applicable to the case, or a failure to give in charge to the jury the law which was required by the evidence in the case, and such error or omission was, under all the circumstances of the case, calculated to prejudice the rights of the accused; in which event, this court, for either cause, will reverse the judgment. In this case the court charged the jury as follows: "What counsel on either side may say in the course of argument as to their personal belief in the guilt or innocence of the defendant, is not in any degree evidence, and as such will be entirely disregarded by you, and you will try the defendant wholly by the law as given you in this charge, and by the testimony admitted to go before you, *and allow nothing else to influence you in finding your verdict.*" *Held* that, in the absence of exception, and in the absence of a showing that the charge was calculated to prejudice the rights of the accused, it was not materially erroneous. See the opinion in extenso for a discussion of the constitutional right of an accused to be heard by counsel, and for an application of the principle to the charge in question.

2. Same.—The charge further reads as follows: "The facts of any case may be established either by direct or circumstantial evidence, and in so far in this case as circumstantial evidence is relied on to convict," etc. The objection (urged for the first time on this appeal) is that the latter clause intimates that direct inculpatory evidence of the defendant's guilt was adduced, and that this was calculated to mislead the jury to the prejudice of the defendant. But *held* that, considered in connection with the charge as a whole, and in the light of the evidence, the charge is not obnoxious as upon the weight of evidence, nor as calculated to mislead the jury to the prejudice of the accused.

3. Same.—The jury was also instructed by the court as follows: "The defendant alleges in this case that if Jennie Roe was murdered by poison, as alleged, that the witnesses Ann Derry and Lewis Cotton stand to said crime in the relation of accomplices." The contention of the appellant is that the said charge was error to his prejudice, because his defense was not that the said witnesses were accomplices, but that they were the sole principals in the crime, and that the defendant was not a party to it. *Held*, that the objection is not well taken. The evidence adduced upon the trial demanded of the trial court an instruction upon the law of accomplices, accessaries and *particeps criminis*; and, being otherwise correct, it is immaterial whether the defense "alleged" the witnesses to be accomplices, or whether the evidence raised that issue.

3

4. SAME—EVIDENCE.—Objections to the admission of evidence will not be considered by this court unless the same are perpetuated by bill of exception, properly incorporated in the transcript.

5. MURDER—FACT CASE.—See the statement of the case for evidence *held* sufficient to support a capital conviction for murder.

APPEAL from the District Court of Grimes. **Tried below below** before the Hon. N. G. Kittrell.

The indictment in this case was presented in open court by the grand jury of Walker county, Texas, on the seventh day of September, 1886. It charged the appellant with the murder, by poison, of his wife, Jennie Roe, in Walker county, Texas, on the seventh day of April, 1886. Upon the motion of the appellant, the venue of the case was changed to Madison county, and thence, by the court, upon its own motion, to Grimes county. This trial, which was had at the October term, 1887, of the Grimes county district court, resulted in the conviction of the appellant in the first degree for the murder of the said Jennie Roe, and the death penalty was assessed against him by the jury.

It appears from the transcript that the written evidence of a number of witnesses, as it was adduced upon the examining trial, was read upon this trial to the jury instead of the witnesses being produced and examined upon the stand. That of Doctor J. N. Gambrell was the first read to the jury. He testified, in substance, that he had been a practising physician since his graduation from the Transylvania University, forty-three years prior to this trial. For twenty-seven of the said forty-three years, he had practised his profession in Walker county, Texas. He knew the defendant and was acquainted with the latter's wife at the time of her death. Mrs. Jennie Roe died on the seventh day of April, 1886, in Walker county, Texas. The witness was called as a physician to see her during her last illness, and reached her bedside at one o'clock p. m., about thirty minutes before she expired. Mrs. Roe was then in convulsions. Doctor Markham reached the house of the defendant about the same time that witness did. No medicine was administered, as the intervals between the spasms were too short to admit of it. Mrs. Roe appeared to have tetanic convulsions, and there was some rigidity of the muscles. The contraction of the muscles endured throughout the convulsions. Both the witness and Doctor Markham were uncertain in their opinions at first, as to

the nature of the deceased's illness. Witness asked Doctor Markham what he thought of the case. He replied that he did not know, and that the nature of the attack was much obscured to him. As the lady drew her last breath, the witness became struck with the similarity of her visible symptoms to strychnine poisoning, and he immediately and rapidly repaired to his home to examine his medical works upon the symptoms of strychnine poison. After an examination of the authorities, he became satisfied that Mrs. Roe had died from strychnine poison. Having satisfied his mind about the case and eaten his dinner, the witness went by Mr. Rome's house, and was asked by him the cause of Mrs. Roe's death. Witness replied that he did not positively know, but strongly suspected it to be the result of strychnine poison. Witness then went on to the house of Mr. U. F. Cotton, who met him and asked the same question, and received the same answer. Witness then learned that Lewis Cotton had that day purchased some strychnine from Mr. U. F. Cotton. He then went to Lewis Cox and asked him to go and question Lewis Cotton about the strychnine that he had purchased that day. Cox promised to go, but after waiting an hour he did not go, and the witness went himself and found Lewis Cotton, who was then talking to John Varnedore, and asked him if he had purchased any strychnine on that day. He replied that he had. Witness then asked him from whom and at what hour he purchased it. He replied that he bought it from Mr. U. F Cotton, between ten and eleven o'clock on that morning. Witness then asked to see the phial in which he got the strychnine. He replied that it was in his overcoat pocket, but that he would get it. He went off to get it, but said that somebody had taken it and a handkerchief from his overcoat pocket. The witness then asked him what he bought the poison for. He replied that he bought it to kill wolves; that, having killed a deer on a hunt two or three weeks before, the wolves interfered with it before he could get it home, and that he was going to try poison on them. The witness was particular in his inquiries of Mr. Roe about the medicine he administered to the deceased. Defendant told witness that he had administered two doses of calomel and Dover's powders to his wife, the night before, and, as the witness understood him, one dose of quinine just before dinner on the fatal day. He told witness that he still had another dose of quinine which he intended to have administered. Witness asked him how large a dose of quinine he gave

before dinner.  He replied that the two doses he had were of a size, and handed the witness a paper of medicine which he took from the mantelpiece.  That paper contained powder in quantity about one-third of a dose usually given to adults.  Witness kept part of the powder.  The other part was analyzed by Doctor Prince and Professor Everhart of the Texas University, in the presence of the witness, and was found by them to be quinine.  Less than one grain of strychnine has been known to produce death.  "The stomach, in the case of a death produced by strychnine, would not retain the poison which produced death, but that part which had been absorbed would necessarily be the most important part of it, and the cause of the death."  It would be hard to determine in every instance of death by strychnine, how much of the poison was taken, but if death ensued within an hour or two after taking, and the post mortem examination discovered a grain in the stomach, the witness would think that as much as one or two grains were swallowed.

On his cross examination, the witness stated that strychnine was soluble when subjected to the action of the acids of the stomach, and strychnine, unless in a state of solution, would not be apt to be taken up by the absorbents of the system.  Strychnine would kill in about thirty minutes, if taken in the quantity sufficient to produce death.  This was the first case of strychnine poisoning, if such it was, that the witness ever had.  It was difficult to diagnose strychnine poisoning, and it was difficult to distinguish such a case from a case of tetanic spasms, without an analysis of the stomach.  A physician familiar with the symptoms of the particular case under treatment could arrive at a definite opinion whether the death of the patient was due to strychnine poisoning or tetanus.  The witness could not, from his limited knowledge of the history of Mrs. Roe's case when he was called in, decide at once whether she died of strychnine poisoning or of tetanus.  If a chemical analysis of a stomach discloses the presence of one grain of strychnine, then it follows that, if death resulted in one or two hours after the taking, that two or three grains of the poison must have been swallowed. When the witness called at Mr. Cox's house to get him to see Lewis Cotton about the purchase of the strychnine, Cox appeared to be busy about something.  He agreed, however, to call on Lewis Cotton presently and report.  After waiting an hour, and Cox failing to go to see Lewis, the witness went himself, and, as stated, found him talking to John Varnedore, in front

of a restaurant on the south side of the square, in Huntsville. When witness asked Lewis for the phial, he went into the restaurant kitchen, got his overcoat, examined the pocket, and reported that both the phial and his handkerchief had been removed by somebody.

On his re-direct examination, the witness testified that, as soon after Mrs. Roe's death as he could refresh his mind by consulting medical authorities (which occupied about thirty minutes), he came to the conclusion that Mrs. Roe's death was due to strychnine poisoning. The witness and defendant were at Mrs. Roe's bedside when the witness asked defendant about the medicine he had given his wife. When defendant replied that he had given calomel, quinine and Dover's powders, one Annie Derry, a negro woman who was in the room, remarked to witness: "There was more than that, Doctor."

On his re-cross examination, the witness stated that his examination of the medical authorities occupied him about fifteen minutes. Mrs. Roe was not dead when the witness asked defendant about the medicine he had given, received his answer, and heard the remark made by Annie Derry. Since the trial of this case in the Madison county district court (November term, 1886), the witness had examined the premises of the defendant and found that, from the place in the room occupied by Annie Derry at the time mentioned in her testimony, she could see the paper of quinine on the mantelpiece, if it was then at the place from which defendant got it when he showed it to the witness. There was a great deal of confusion and excitement in the defendant's house just before the death of Mrs. Roe. Mrs. Roe was very nervous and excited. She would repulse everybody who attempted to approach or touch her, and would be seized with a convulsion if touched by anybody. The witness saw Lewis Cotton in front of the room in which Mrs. Roe died, about five minutes after her death. Lewis's excited manner at the time aroused the suspicion of the witness.

Doctor T. H. Markham testified, for the State, that he reached the bedside of Mrs. Roe a few minutes after one o'clock p. m., and found her in convulsions. The convulsions were of the kind known as tetanic, or lockjaw. There was little or no difference in the general symptoms of the convulsions produced by tetanus and those produced by strychnine poison. Death was, ordinarily, more speedy from the poison than from tetanus. Witness was

unable to state positively, from the symptoms, the cause of Mrs. Roe's death.

Mrs. E. J. Rountree testified, for the State, that the defendant and his family, at the time of Mrs. Roe's death, were living in a house known as "the office," on the witness's place. Between twelve and one o'clock on the fatal day, Annie Derry came to witness and exclaimed excitedly: "O! Mrs. Rountree, Mr. Roe says come there quick; that Mrs. Roe is fainting." When witness reached the office she found Mrs. Roe lying on her bed, and defendant bathing her face and hands with camphor. Deceased at once asked witness: "What in the world is the matter with me?" The witness replied that she did not know, but thought she had a chill. Within the next few moments Mrs. Roe turned black in the face, and witness sent for Mrs. Wiley to help her do something. Mrs. Wiley appeared in a few minutes, and Mrs. Roe asked her: "Is that you Mrs. Barrett?" Mrs. Wiley replied: "No; I am Mrs. Wiley." Mrs. Roe then asked: "Mrs. Wiley, for God's sake, what is the matter with me?" Mrs. Wiley then directed that a physician be summoned at once, and defendant went off to get one. Doctor Gambrell came shortly, and was almost immediately followed by Doctor Markham. Mr. Lewis Cox and Miss Kate Cox came about the same time, and deceased, addressing the former, said: "O! Uncle Lewis, you love me and have always been kind to me, and I want to tell you something." Mr. Cox remarked to her: "Be quiet, and let us do something for you." Mrs. Roe again told Mr. Cox that she wanted to tell him something, and immediately exclaimed: "O! Such a beautiful dream I had! Let me go to sleep and dream it again." When the witness first entered the room the defendant asked her if he had not better go after a doctor. Mrs. Roe called to him: "Don't you go; you stay!" Defendant then sent the girl. It was then decided to bathe her, and when, in order to do so, it was decided to change her position in bed, the defendant started towards her feet to assist, when Mrs. Roe called to him: "Go back; don't you come!" Mrs. Roe was perfectly rational, except during the intervals of convulsions. While the witness and Mrs. Wiley were bathing Mrs. Roe's feet she complained of pain in them, and said that they felt as though they were asleep. It appeared that, after Mrs. Roe spoke of her dream, she realized her condition. She then began to call for her father. When the deceased asked witness, when witness first reached her, what was the matter with her, the woman

Annie Derry, who was then in the room, remarked: "It is that medicine she took; that is what is the matter with her. Here is the spoon she took it out of, and it doesn't look like quinine; it looks like salts." Annie Derry repeated that statement several times. Doctor Oliphant tested the sediment in the bowl of the spoon, and said it was only quinine and coffee. Annie Derry, speaking of the medicine, said that it was either too strong or was poison. The "office," occupied by defendant and his family, was a two roomed cottage. The rent on that cottage had not been paid for about two and a half months at the time of Mrs. Roe's death. While Roe was in San Antonio Mrs. Roe borrowed fifty cents from the witness with which to buy some food for her children, telling witness then that, had she known Mr. Roe would be gone so long, she would have gotten sufficient expense money from him before he left. The defendant's conduct towards Mrs. Roe was, so far as witness knew, that of a kind husband, and witness had heard one lady remark that, whatever people might say of Roe, he was certainly a kind man to his wife.

Ben E. McCulloch testified, for the State, that he was acquainted with the defendant, and knew Mrs. Roe at the time of her death. The witness was a member of the order of Knights and Ladies of Honor, and was secretary of the local organization at Huntsville, known as "Naomi Lodge, No. 297, Knights and Ladies of Honor." The said order was an insurance organization, conducted upon the mutual plan of insurance, its other objects being of social and benevolent character. Its life insurance feature was maintained by assessments upon members to pay death benefits. Men and women were alike eligible to membership. Both the defendant and his deceased wife were members of the said lodge, their initiation occurring on March 26, 1883. They were registered in half rate classes A and B. The original insurance of the order was one thousand dollars, but, by a subsequent edict of the grand lodge, class B was established, and under that a member could increase his policies to the extent of two thousand dollars. A half rate B class, whereunder a member could increase his insurance by one thousand dollars, was established by the grand lodge at the same time. Two policies were issued on the life of Mrs. Jennie Roe—one for one thousand dollars in half rate class A, and the other for one thousand dollars in half rate class B, and both were payable to defendant upon the death of his wife. The same policies inured to Mrs. Jennie Roe on the death of defendant, if his death pre-

ceded hers.   Defendant and his wife, from their initiation, were members of the order in good standing, with this explanation: "The law (of the order) requires assessments to be paid within thirty days from the date on which due.   Eleven members of the order failed to pay the March assessment by April 1, and were notified of their suspension.   On April 5, F. E. Markham, one of the suspended members, asked me why, on April 2, I refused to receive from his brother certain moneys left by him and other delinquents with his brother, to be paid as dues.   I replied that under the law I could not receive the money from his brother on April 2.   He said to me. "Your notice stated that we had until April 2 to pay."   He produced the notice, and when I saw that it did give delinquents until April 2 to pay, I told him that I would receive the money.   All of the other delinquents had left the money with different persons to pay their dues on April 1 (I then being absent from home), except W. H. Roe, who called at my office on April 1 and left a note stating that he had called to pay his assessment of two dollars and sixty cents.   On the sixth of April, in consequence of Roe's note, I wrote him that he could call and pay his assessment on that day, and he called after supper and paid it."   By reason of the death of Mrs. Jennie Roe, on April 7, 1886, the defendant became entitled to receive from the order the sum of two thousand dollars.   On the second day before this trial, Mr. Lewis Cox asked witness what steps had been taken towards the collection of the policy on Mrs. Roe's life.   Witness told him that he had sent for the necessary blanks.   Mr. Cox replied, in effect, that he had heard an effort to defeat the payment would be made, and that it was his opinion that if payment was defeated it would break up the lodge organization in Huntsville.

On his cross examination, the witness testified that Lewis Cox, when he spoke to him about the insurance on Mrs. Roe's life, did not claim to represent the defendant.   He said that Doctor Oliphant and other members had expressed to him their belief that the non-payment of the policy on Mrs. Roe's life would break up the order in Huntsville, and that he (Lewis Cox) would withdraw.   In his note to witness about his unpaid assessment, the defendant said that Mr. Varnedore would attend to the payment of it, and that the reason it had not been paid was Mrs. Roe's sickness.   Witness heard that Mrs. Roe, about that time, had an attack of flux, at Captain Kelly's place. Witness was in or about his office daily during March and

April, except about twelve hours on April 1. Witness had an official connection with the State penitentiary, and defendant was employed there until he resigned to run for the office of city marshal of Huntsville.

U. F. Cotton was the next witness whose written testimony upon the examining trial was read by the State. It shows that, on the examining trial, the witness testified that he had been acquainted with both the defendant and Lewis Cotton for many years. The witness was a druggist by profession, and was the proprietor of a drug store in Huntsville on the seventh day of April, 1886. About eleven o'clock on the morning of that day, Lewis Cotton came to the witness's drug store to buy some strychnine. He threw a twenty-five cent piece on the counter and said that he wanted the worth of it in strychnine. Witness picked up the quarter and finished his dealing with a customer upon whom he was waiting when Lewis came in. When the witness was through with the customer, Lewis repeated his call for the strychnine, remarked that he knew it was a particular drug to buy, but that he only wanted to use it on wolves, and asked witness if it would kill wolves. The witness replied that it would, and gave him a small bottle of strychnine that had never been unsealed. Witness observed Lewis's manner the more particularly because he kept repeating that he only wanted the strychnine to kill wolves. The bottle delivered by witness to Lewis Cotton was wrapped in yellow paper and contained a drachm of strychnine. A drachm was supposed to contain sixty grains. The bottle of strychnine delivered to Lewis Cotton came from the same stock of strychnine as the bottle of strychnine exhibited on this (the examining) trial. Lewis Cotton left the drug store as soon as he got the strychnine. On his cross examination this witness stated that he sold defendant medicine, and filled prescriptions for him at different times prior to the purchase of the strychnine by Lewis Cotton. To the best of his recollection, though he could not be positive as to time, he sold defendant some medicine on the Saturday night before the city election in Huntsville. That election was held on April 6, 1886. The medicine then sold by the witness to the defendant was calomel and something else which may have been morphine and camphor. The witness thought that Mr. Thompson was present when witness made this sale to defendant.

Dock Bennett testified, for the State, that he lived in Walker

county, Texas, about a mile south from Huntsville. He rode into town on his mule quite early on the morning of April 7, 1886. As the witness was passing the court house on his way home, about half-past nine o'clock, the defendant beckoned to him from the upstairs window of the court house. Witness rode back and met defendant at the horse rack on the south side of the court house. Defendant asked witness if he was going home. Upon the witness replying that he was, the defendant asked if his road did not pass the house of Lewis Cotton. Witness replied that it did, and defendant asked witness to stop at Lewis's house and tell Lewis to come at once to the court house, as he wanted to see him. Witness went on and stopped at the house on Mrs. Hume's place where Lewis Cotton lived, and called for him. Lewis's mother-in-law, Winnie Daniel, came to the door. The witness asked her if Lewis Cotton was at home. She replied that he was and witness charged her to give Lewis the message entrusted to him by defendant. The witness did not see Lewis Cotton at all, nor see the defendant again, on that day.

On his cross examination, the witness said that he was in town on the Friday following the municipal election, and worked that day in Mrs. Annie Gibbs's garden. He admitted that he met Lewis Cox on the evening of that day, and that, in the conversation which ensued, he denied to Cox that he carried a message from defendant to Lewis Cotton on the day of but before the death of Mrs. Roe. When the defendant charged witness with the message to Lewis Cotton, he did not tell witness to tell Lewis that he, Lewis, was called at and had better hasten to the court house. The defendant was on the county court jury during the week including the seventh day of April, 1886. The witness did not know that Lewis Cotton was a witness in the Billy Kittrell case, which was pending in the county court during that week. No one was near witness and defendant when they had the conversation at the horse rack. Witness denied that he ever made to George Shepherd the same statement that he made to Lewis Cox. Witness saw Mr. John Varnedore after the inquest on the body of Mrs. Roe, and Varnedore told him that defendant said that he, defendant, did send word to Lewis Cotton by witness, but that it was on Tuesday, April 6, 1886, and not on April 7. Witness replied to Varnedore that at first he was not satisfied in his own mind whether it was on Tuesday or Wednesday that defendant sent the word to Lewis

Cotton by him, but that, upon reflection, he knew it to have been Wednesday, the day of the death of Mrs. Roe. The witness testified upon the inquest that defendant sent the message by him to Lewis Cotton on Wednesday, April 7.

Re-examined, the witness stated that Lewis Cox, who, he thought, was related to defendant, did not, when he came to Mrs. Gibbs's garden to see him, say that he was sent by any person. Cox said to witness: "Now tell me the truth; did you carry any message to Lewis Cotton from Bill Roe on Wednesday?" Witness replied: "No;" and Cox said: "You have said that; now stick to it. God damn him (meaning Lewis Cotton), we have got him now!" Mr. Cox then went on towards town, remarking, according to the recollection of the witness: "That case will come up this evening." Witness went before the coroner's jury about two o'clock on that day, and was on the stand about two hours. After leaving the inquest, the witness was called by Mr. Varnedore into his store, and there had the conversation with said Varnedore detailed by the witness on cross examination. On the same day, and after the witness had been before the inquest, and in the same garden where he had the first conversation with Lewis Cox, the witness had another conversation with him. Witness then told Mr. Cox that he had been before the inquest and had testified to the truth about the matter. Cox said: "God damn you! I would not believe one of you on oath to save your lives!" He appeared to be very angry with witness, and went off at once without saying anything more. The witness had had no subsequent conversation with the said Lewis Cox. He could remember no subsequent conversation about the matter with Mr. Varnedore, nor with any of the other relatives of the defendant. Varnedore's wife was the defendant's sister. Witness was in town on April 6, the day of the election. His business in town on the next day was to ascertain the result of the election, and he was on his return home when he was called by the defendant and entrusted with the message to Cotton. A great deal of excitement about Mrs. Roe's sudden death was prevalent on Friday, and witness did not want to talk about it, especially to the relatives of the defendant. The witness knew on Friday that the defendant was suspected of having poisoned his wife. Re-cross examined, the witness said that when Mr. Lewis Cox came to him in Mrs. Gibbs's garden, he asked him if he had been before the inquest. The witness replied that he had, and that he had testified to the truth about the message. Cox

replied: "That is all we have asked of you." Witness then told Cox what he had testified, and Cox angrily asked him: "Why didn't you tell me that in our first conversation?" He then turned off with the remark: "G—d damn you! I wouldn't believe any of you on oath." Two preachers were staying at Lewis Cotton's at the time witness went to his house, but witness did not see them.

Lewis Cotton was the next witness for the State. He testified that he had known the defendant all his life, and knew Mrs. Roe from her childhood until her death. He had always been upon friendly terms with the defendant, and had been intimate with him since his marriage with the deceased. Mrs. Roe was between twenty-two and twenty-three years old when she died. On Wednesday, April 7, 1886, the day after the city election in Huntsville, Dock Bennett stopped at witness's gate, and told witness that the defendant had sent word by him for witness to come to him in town at once. This was about nine, or a few minutes after nine, o'clock in the morning. After a while the witness left home for town, going by Mr. Angier's house to Frank Jones's blacksmith shop, and thence to Bradley's saloon, on the steps of which he stopped, and was soon joined by the defendant. It was now between ten and eleven o'clock. Defendant came to witness from the direction of the barber shop. As he came up defendant asked witness: "What makes you look so drawn up ? Why haven't you got on your overcoat ?" Witness replied that he did not need an overcoat, and that the cause of his unwell feeling was a quantity of beans he had eaten on the night before. Defendant then asked the witness to treat. Witness replied he was not able to do so; that he had but twenty-five cents in money with him, and a dollar and a half at Bennett's. The defendant replied that that was more than he had, and witness bought twenty-five cents worth of whisky from Bradley, and he and defendant repaired to Bradley's back steps and drank some of it. They then began a conversation about the election on the day before, and as they talked they passed out of Bradley's saloon, and went up the street towards Herndon's saloon. They went into the alley between Herndon's saloon and Ann Travis's restaurant, and defendant proceeded to enumerate the negroes who had voted against him on the day before, marking them on the wall of the restaurant. Witness remarked to him: "It is no use to discuss the election; you are beaten, and I told you that, unless you got some white votes, you would be beaten."

They then stepped from the alley, when defendant produced twenty-five cents, handed it to witness and asked him to go to Bush's drug store and get the worth of it in strychnine. This was between ten and eleven o'clock. Witness asked him what he was going to do with strychnine. He replied: . "I want to kill some dogs at Mr. Rountree's so that I can get to that big fat colored girl at Mr. Rountree's." Witness said to him: "Mr. Roe, you ought not to kill your neighbor's dogs for such a purpose as that." Witness then started off slowly, and defendant urged him to hurry. Witness replied that he was not in a hurry, but would buy the strychnine from Mr. Cotton's drug store, as he made it a point to spend money, when he had it to spend, with gentlemen who at other times extended him credit. Witness then crossed the street to U. F. Cotton's drug store, and found Mr. Cotton at his counter on the right hand side of his store, wrapping up a parcel for a customer. Witness threw the quarter on the counter, and told Mr. Cotton that he wanted the value of it in strychnine, and that (as defendant told him to tell Cotton) he wanted it to kill dogs and wolves. Mr. Cotton then gave the witness a small package which he wrapped in liver colored paper. From Cotton's drug store the witness, with the package in his left hand, went to Mr. Bennett's store and got from Mr. Bennett a dollar and a half that had been left for him. From Bennett's the witness went across the square to a point near Parish's store and in front of or opposite to the opera house gate, where the defendant met him and asked : "Have you got it?" The witness replied in the affirmative, and handed him the package which, a few minutes before, he received from Mr. Cotton. Defendant then said to witness : "If any body ever asks you what you did with this bottle of strychnine, you tell them that you put it in the pocket of your overcoat which you say is hanging in Ann Travis's restaurant." The witness then went to Mr. Josey's wagon, which was then standing on the street, and in which Josey's son was then sitting. The wagon had just come from towards the post office. Defendant and the boy who, as witness supposed, was a son of Mr. Josey, were talking about a man named Bookman who was supposed to have left Huntsville on that morning's train. Josey's son was connected in some way with the express busines. Witness then went on towards Herndon's saloon, and the defendant, when witness last saw him on that morning, was crossing the street and going towards Var-

nedore's store, and his, the defendant's, home. It was then be-tween eleven and twelve o'clock.

About an hour after the witnest saw the defendant crossing the street and going towards Varnedore's store and his home, Annie Derry passed Varnedore's store and reported the death of Mrs. Roe. This was the first intimation witness had of Mrs. Roe's sickness or death. Witness turned to Sam Flood, who was standing near, and asked him to go with him to Roe's house. Flood declined upon the ground that he did not have time, and witness went alone. On reaching the premises the witness found Mr. James Kelly, the brother of Mrs. Roe, leaning over the rail-ing in front of the house. Witness went on three errands for the family, and, when he returned from the third, he saw the defendant and Mr. L. A. Cox standing together above the house and between the house and the stable. Mr. Cox came to witness and told him that the defendant wanted to see him. Witness went to defendant, and defendant said to him: "Don't leave; I may want you to attend to some other matters. Don't tell any-body that you gave me that little bottle of strychnine." Wit-ness asked why he should not tell it, and what he had done with it. Defendant replied that he had thrown it away. Witness then asked him why he had thrown it away, and demanded that he return it. Defendant replied simply that he had thrown the bottle of strychnine away, and witness turned off. About that time defendant's brother, Mr. Lew Roe, and Mr. Lewis Cox left the house and went to town, and witness followed them. It was then, as well as the witness could compute the time, about mid afternoon. Witness did not see the defendant again until next morning, when, on his way to town, he saw him at Captain Hunter's gate. Witness had met Sandy Brown near the north-east corner of the penitentiary wall, and had been told by him that defendant wanted to see him at Captain Hunter's. When the witness reached Captain Hunter's gate, he was joined by defendant, who came from Hunter's house. He asked witness if he had seen Smith Hume. The witness replied that he had just seen Mr. Hume, who summoned him to appear before the coroner's inquest, then in session. Defendant then asked wit-ness to take his buggy home for him. Witness replied that he did not have time, but must go on to court. Defendant then said: "I want you to stick to what you have said." The witness replied: "I don't want to go to jail." Defendant replied: "I am going to stick to what I have said, if I have to go to jail, and

you had better do the same." Defendant then said: "I went to your house last night to see you, but your wife said you were not there." The witness was not at home on that night; he spent that night at the Burnett place. Witness asked defendant what he wanted of him there, and he said that he wanted witness to go for him out to Mr. Jimmy Johnson's place. Witness did not go. Defendant's family consisted of himself, his wife and two children, the elder of which was about two years of age.

Cross examined, the witness said that he spent the larger part, but not all, of Tuesday night at home. He got home from town before night, and soon left to go to the Burnett place, to see Linda Lewis. He reached the Burnett place about nine o'clock, and stayed there about an hour, when he returned, reaching home between ten and eleven o'clock. Witness was in the habit of visiting Linda Lewis, who, with two other women, lived on the Burnett place. Witness was certain that he went himself and did not send to the Burnett place on that night for the women. He sent Nath Wade to the Burnett place to tell Linda to come to town on Wednesday night, which she did, meeting witness on the steps at Bradley's saloon. During the witness's employment in Bradley's saloon he was in the habit of sending special messengers after Linda. He quit the saloon on December 30, 1885. On or about March 1, 1886, the witness first learned that Linda was living at the Burnett place. The witness's reason for sending Nath Wade after Linda was to see her and get something from her. When he met her on Wednesday night he told her that an effort was being made to get him into trouble about a bottle of strychnine which he had bought for Mr. Roe. Linda then said that she would get the witness a bottle of strychnine from Doctor Lennox, and she went off down the street. Witness did know where Doctor Lennox lived. Witness saw Linda again on that night near the opera house, in company with Patsy Jones. Witness did not ask her if she got the strychnine, nor did she, when she and witness reached her home, tell him that Doctor Lennox asked her what she wanted with strychnine, and that, upon telling him that she wanted to use it as rat poison, Doctor Lennox told her he would not give her strychnine, but that if she would call the next day he would fix her a preparation that would kill rats. Witness got up about eight o'clock on Wednesday morning, and it was about nine o'clock when he saw Dock Bennett, who came to his house riding a mule. Witness's wife and mother-in-law were in the house at

the time, and heard Bennett tell witness that defendant had sent him to tell him (witness) to come to town. Witness went to town about ten o'clock. Witness, on his way to town, after receiving defendant's message, stopped at Frank Jones's blacksmith shop about five minutes, but did not ask anybody about the defendant. Thence witness went to Bradley's, and ate his dinner on Bradley's steps.

·Witness was an active worker in the interest of the defendant throughout the election on the day before. The witness and the defendant were behind Bradley's saloon about fifteen minutes, on the morning of April 7, talking about the election. They each took two drinks of whisky while there. Their first stop, after leaving Bradley's saloon, was at Ann Travis's restaurant, in which, and at Herndon's saloon, witness had often before left his overcoat. He had hung up his overcoat in Travis's saloon on the day before, and it was still there. In the afternoon of the fatal day, and after Mrs. Roe's death, Lewis Cox came to Sam Irving's barber shop and called witness thence to the back yard. The witness did not, in that conversation, tell Mr. Cox that, when Ann Derry told him of Mrs. Roe's death, which was his first information of it, he still had the bottle of strychnine in his possession, but went immediately and put it in the pocket of his overcoat, which was then hanging in Ann Travis's restaurant. Mr. Cox did not, while sitting on a table in Sam Irving's back yard, say to witness: "The doctors seem to think that Jennie died from poison." Witness did not, in reply to Mr. Cox, ask: "Was she poisoned?" Nor did Cox answer: "No; she died from cramp colic." Mr. Cox then said to witness: "Lewis, you have known us always. If it is found out that Jennie was poisoned, people will say that Bill Roe did it. You must stick to what you said to Doctor Gambrell." Mr. Cox, as he left the table in the yard, remarked to witness: "They know you bought a bottle of strychnine in the morning. They will think you bought it for Bill Roe; and, Lewis, I don't want you to say anything that will hurt the family. Doctor Markham don't seem to think she was poisoned. All I ask you is to stick to what you said to Doctor Gambrell." Witness had a conversation on the same afternoon with John Varnedore, at the brick saloon. Witness did not, in that conversation, tell Varnedore that the bottle of strychnine he got from Mr. Cotton was stolen from his overcoat pocket, nor did he make such statement to Lewis Cox on that evening. Witness had a conversation with Mr. Adair on the night of the

fatal day, at the corner of the opera house, but did not tell him
positively that the bottle of strychnine purchased by him that
day was stolen from his overcoat pocket.    After Mrs. Roe's
death, Doctor Gambrell came to witness and asked him if he
bought a bottle of strychnine on that day.    The witness replied
that he did.    Doctor Gambrell then asked where it was, and told
witness to get it.    Witness told Doctor Gambrell that the bottle
of strychnine was in his overcoat pocket, in Ann Travis's res-
taurant—answering just as the defendant told him to do if asked
about it.    Witness then got the coat, brought it to the table,
searched the pockets, and, of course, did not find the bottle.
When, shortly after Mrs. Roe's death, the witness returned to
Roe's house from the second errand on which he was sent, he
saw the defendant talking to Mr. James Kelly, and heard him
tell Kelly about giving Mrs. Roe some medicine on the night be-
fore.    The death of Mrs. Roe grievously frightened the witness,
inasmuch as, but a short time before, he bought the poison for
the defendant upon his statement that he intended to use it on
dogs.    Witness was now in the custody of the sheriff, but was
unable to say whether it was as a defendant or as a witness.
The testimony of the witness before the coroner's jury was false.
He swore falsely before that tribunal because he was frightened;
realized that the poison he purchased for Roe had got him into
trouble, and had little or no idea of what it would lead to.    The
witness's testimony, as disclosed by the record of the coroner's
trial, was to the effect that, on the morning of April 7, he bought
a bottle of strychnine from Mr. U. F. Cotton, his purpose being
to use it to kill wolves that had been annoying his dogs, and he
so told Mr. Cotton at the time he purchased it; that he had the
strychnine in his overcoat pocket at about twelve o'clock, his
overcoat then being in Ann Travis's restaurant.    Ann Derry was
in the restaurant when he put the strychnine in his overcoat
pocket, and witness was of opinion that she took it.    Witness
did not go to look after the strychnine until Doctor Gambrell
asked him about it.    After hearing of Mrs. Roe's death, witness
asked Ann Travis who had been about his overcoat, and she said
that she thought Ann Derry had.    Witness did not see Mr. Roe
after taking a drink with him at Bradley's saloon, and had no
conversation with him after that.

Winnie Damon was the next witness for the State.    She testi-
fied that she was the mother-in-law of Lewis Cotton, who, with
his wife, lived with witness in a small house in the corner of

Mrs. Hume's yard. On the morning after the election, being Wednesday morning, April 7, Dock Bennett rode up to witness's gate and hailed. The witness went to the door, and Bennett asked if Lewis was at home. Witness replied that he was, and Bennett told her to tell Lewis that Mr. Roe had asked him to stop and tell him (Lewis) to come to town at once to see him. Dock Bennett left at once, and witness delivered his message to Lewis Cotton. Lewis remained at the house for thirty minutes, talking to the preachers, Lynch and Manuel, who were there, and then he left, going toward town. On the night of the same day, after witness's household had gone to bed, somebody came to the house and hailed. He asked if Lewis Cotton was at home, and was told that he was not. Lewis's wife asked who the party was, but he merely answered that he wanted to see Lewis Cotton, and wanted to get him to go to Johnson's. Witness did not recognize the voice, but thought it was that of the defendant or Adair. When informed that Lewis was not at home, the party left. On her cross-examination the witness said that Lewis Cotton did not, on the morning of the fatal day, complain of being sick from the effects of beans which he had eaten the night before. She could not remember whether it was before or after sunrise when her household got up on the fatal day, but it was about or near nine o'clock when Dock Bennett brought the mes_sage to Lewis from defendant. The preachers remained at the house for some little time after Lewis Cotton went to town. The voice of the man who called at the house on that night appeared to be disguised.

Frances Cotton, the daughter of the preceding witness, and the wife of the witness Lewis Cotton, testified, for the State, that early on the morning of the fatal day Dock Bennett came to her house and called for her husband. Witness's mother went to the door, and Bennett, in the hearing of witness, told witness's mother to tell Lewis Cotton that Mr. Roe directed him to tell Lewis to come to him in town, and to come at once. Witness then heard her mother tell Lewis that Bennett told her to tell him that Roe had sent word by him (Bennett) to Lewis to join him (Roe) in town at once. Lewis remained at the house about thirty minutes after Bennett left, talking to the preachers, Lynch and Manuel, and then went to town. Lewis returned home to dinner about two o'clock, and left again about three. Witness next saw her husband on the street, under arrest, but she could not now tell on what day that was, but it

was her understanding that he has been under arrest ever since. Lewis Cotton did not stay at his home on the night of the fatal day. After the witness's household had retired for the night somebody knocked on the door. Witness, without getting up, asked who was knocking. A voice replied asking for Lewis. Witness replied that he was not at home, and again asked who the person was. The voice replied either "One" or "Roe," witness could not tell which. The voice then told witness to tell Lewis, when he came home, that Mr. Roe wanted him to go somewhere for him. The party then left and witness never did know positively who that person was. Witness observed that the person was attempting to disguise the voice, and she thought it was the voice either of George Collins or the defendant. On her cross examination witness said that her husband, the said Lewis Cotton, was at home on Tuesday night, the night before Mrs. Roe's death. Lewis was complaining of feeling unwell on the morning of the fatal day, but witness heard nothing about beans. Concluding her testimony the witness said : "I did not hear my mother tell Lewis that Dock Bennett said Roe wanted him, and I did not so state in my former testimony."

Sandy Brown testified, for the State, that on the day after the city election in Huntsville, which election as shown by other testimony occurred on Tuesday, April 6, 1886, he saw the defendant in front of Ann Travis's restaurant in the said city of Huntsville, and at that time and place told Lewis that Mr. Roe wanted to see him. That point was near the northeast corner of the Penitentiary. Mr. Roe was then in sight of Lewis Cotton, going towards Mr. Hunter's house in Mr. Hunter's buggy. Mr. Roe went on to Mr. Hunter's, and Lewis followed, and the witness next saw Lewis and Roe talking over Mr. Hunter's gate. About twenty minutes had then elapsed since witness told Lewis that Roe wanted to see him. Witness did not see either Lewis or Roe again on that day. On his cross examination, this witness said that, when he told him to call Lewis, the defendant did not say to him that he wanted to get Lewis to take Hunter's buggy home. He merely asked witness if that was not Lewis Cotton standing off a short distance, and directed him to tell Cotton that he wanted to see him at Hunter's. Miss Minnie Hunter and defendant's oldest child were in the buggy with the defendant at that time. Witness saw Lewis Cotton and the defendant together at Ann Travis's restaurant about eleven o'clock on the fatal day.

Anne Derry was the next witness for the State.  She testified, that she knew the defendant and his wife Jennie at the time of the latter's death, which occurred in Huntsville on April 7, 1886. The witness had a conversation with defendant at Ann Travis's restaurant on the fatal day.  Defendant told her to go to his house and stay with his wife until he got home, and to tell his wife that he would "bring the quinine" when he came.

Witness did not go to defendant's house at once, but went home, lay down across her bed and went to sleep.  She slept until she was aroused by the blowing of the whistle at the penitentiary, when she got up and went to defendant's house, reaching there about ten minutes past twelve o'clock.  Defendant and his family were then at home.  When the witness stepped into the house, Mrs. Roe remarked that she was very glad to see her, and defendant produced two papers of medicine from his pocket. The medicine from one of those papers he gave to his wife. The other paper of medicine he placed on the mantel piece. When the defendant handed Mrs. Roe the paper of medicine to take, he told her that it was quinine.  She emptied the medicine from the paper into a spoon, poured some coffee on it, attempted to dissolve it, and remarked to defendant: "Papa, it is very singular quinine; where did you get it?"  Defendant replied that he got the medicine from Mr. Robinson.  The medicine did not look like quinine to the witness, but looked to her exactly like salts.  Mrs. Roe swallowed the medicine, and then took about two table spoonsful of coffee and ate two or three small pieces of pickle and a mouthful of rice.  She then got up, took her baby in her arms and went into her room, followed by the defendant.  The witness then heard Mrs. Roe ask defendant where he was going.  He replied that he was going to town; that he had been called on the jury.  Mrs. Roe in reply to him said: "Papa, please don't go; I feel so bad."  She then asked Mr. Roe to throw some camphor over her face.  Defendant then called witness into his wife's room and asked witness what was the matter with her.  Witness looked at Mrs. Roe and told defendant that she was in a fit or a faint or had a spasm, she did not know which.  Mrs. Roe was then lying across the bed with her hands closed and her body jerking all over.  It was not yet full thirty minutes since she took the medicine.  Defendant sent witness to summon Mrs. Rountree.  Before reaching the house, Mrs. Rountree asked witness what was the matter with Mrs. Roe, and witness told her that she had either taken medicine

that was too strong or poison. As soon as Mrs. Rountree entered the room, Mrs. Roe asked her: "What in the world is the matter with me?" Mrs. Rountree replied that she did not know, and Mrs. Roe then said that her "nerves were drawing." Mrs. Rountree then suggested to defendant to go for a doctor. Mrs. Roe told defendant not to go, but to send witness, and witness went at once for Doctor Markham, leaving defendant and Mrs. Rountree with Mrs. Roe. Witness came back almost immediately with Doctor Markham, Doctor Gambrell reaching the house about the same time. Mrs. Roe's condition then was about the same as when witness left to go after the doctor. The medicine in the bottle now exhibited to witness, which, according to the doctors, was strychnine, was alike in appearance to that given by defendant to Mrs. Roe as quinine. Mrs. Roe took no medicine other than the dose administered by defendant in the presence of the witness.

Cross examined, witness said that she knew very little about salts, morphine or strychnine, but knew quinine when taken by her. Witness could not solemnly swear that the medicine in the bottle in evidence and that administered by defendant to his wife was of a kind, but they looked very much alike. A bottle of quinine was here exhibited to the witness by the defendant, and she identified it as quinine. She was next shown a bottle of morphine, and she said she was unable to tell whether it was quinine or not, although it resembled quinine. She was next shown a phial of salts, and recognized its contents as salts. The only difference in the appearance of the salts exhibited in court and the medicine given to Mrs. Roe by the defendant was that the latter medicine looked like fine particles of powdered glass and like the medicine exhibited in court as strychnine. She was not sufficiently acquainted with salts to say what kind of salts Mrs. Roe took. When defendant met witness on the morning of the fatal day and asked her to go to his house and wait on his wife he told her that he was on the jury and could not get off. Witness told him at that time that she wanted some money, and he replied to her: "You and my wife for that." After taking the medicine Mrs. Roe turned the spoon upside down on the mantel, and the witness never afterwards saw it. Mrs. Roe, about a week before her death, was sick at Mr. Kelly's house. When witness first reached Mrs. Roe on the fatal day, Mrs. Roe told her that she was suffering with neuralgia, and was going to take some quinine to correct the roaring in her head. She then

had the substance in her hand which the defendant had just given her, and it was the same which she took almost immediately afterwards. Bart Carter was at Ann Travis's restaurant when defendant came there to get witness to go to his house, and was near enough witness to hear the conversation between defendant and witness. Ann Travis and no one else was in the restaurant at the same time. The witness did not see either Lewis Cotton or Sam Flood when, shortly after Mrs. Roe's death, she reported that event to Bart Carter, Gabe Kizzee, John Robinett and Ann Travis. Witness did not report Mrs. Roe's death to Lewis Cotton. The witness did not know who cooked dinner at defendant's house on the fatal day. It was already cooked when witness got there. She knew of no one else on the place but Mrs. Roe, who could have cooked it. The witness denied that on the previous trial of this case in the Madison county district court she testified that when Mrs. Roe seized the pickles to eat them she tried to prevent her and told her that if she ate the pickles they would kill her. The coffee turned very black after it was poured into the spoon containing the substance which Mrs. Roe took as quinine. "I did not know anything about the handkerchief which Mr. Adair put on my lap. It may have been my brother-in-law's handkerchief. I never asked any one about it, and don't know what became of it." Witness had never seen any strychnine, to know it, but had seen dogs die from strychnine poisoning.

Professor Edgar Everhart, one of the faculty of the University of Texas, was the next witness for the State. He testified that he occupied the chair of chemistry in the State University, and that he had made chemistry a professional specialty since 1873, and since that time had devoted himself exclusively to that branch of learning. He had occupied the chair of chemistry in the said university since 1884. He was acquainted with W. D. Adair, meeting him for the first time on the tenth day of April, 1886, in his (witness's) private laboratory in the City of Austin, the seat of the said university. The purpose of Mr. Adair's visit to witness, as explained by Mr. Adair, was to get witness to make a chemical analysis of a human stomach, the purpose of such analysis being to determine whether or not the said stomach contained strychnine or other poison; the examination to be directed especially to the detection of strychnine. Mr. Adair delivered to witness a glass jar, closed with a glass stopper, the said stopper being sealed over with plaster of paris. To the said.

stopper was attached an affidavit which was signed by Doctors Prince and Oliphant; which said affidavit set forth that the said jar contained a stomach. The witness found that it was impossible to begin his analysis of the stomach on that day, and, accordingly, he placed the box which contained the jar and stomach in a small room, and then securely locked that room and sealed it with a private seal. He found the room intact on the next morning, and he also found that the box, the jar and its contents were just as he left them on the night before, the stopper and seal on the jar being intact. Always, on leaving the room, after he began analyzing the stomach, the witness locked and sealed it.

Preliminary to his analysis, the witness subdivided the stomach into small parts, using sharp surgical scissors. This was done in a perfectly clean porcelain dish. After the subdivision of the stomach it and its contents were placed in a clean glass flask. To this was added some water, acidulated with sulphuric acid, or oil of vitrol, and it was then digested at a temperature of about one hundred and twenty degrees, this process covering a period of several hours, the purpose being to reduce to a solution any alkaloids or like poisons that might be present. After this digestion the contents of the flask were strained through a piece of fine silk, or, as it is technically called, "bolting cloth," and the residuum, or that substance which did not pass through the bolting cloth, in the straining process, was treated the second time with acidulated water; and this was likewise digested for several hours, and again strained. The liquids strained in the two processes were mixed together, and evaporated at a temperature of boiling water, to the consistency of syrup. This in turn was mixed with about four times its volume of pure alcohol (about ninety per cent) and allowed to digest at ordinary temperature for something over twenty-four hours. This alcoholic solution, supposed to contain the alkaloids, was filtered through fine filter paper. It was then placed in a retort and the alcohol distilled off, the result of which process was to leave merely an aqueous solution with an acid reaction. This was slightly diluted with water, and transferred to a glass stopped bottle, and shaken with petroleum ether; the petroleum ether, after being separated from the aqueous solution, was evaporated to dryness in watch glasses and tested for alkaloids. No reaction took place, which indicated the absence of alkaloids in that petroleum ether extract. The aqueous solution

was treated successively, still in acid solution, with benzine and chloroform. The absence of alkaloids that could be extracted under these conditions, was proved at this stage of the examination. It then became necessary to change the aqueous solution from acid to alkaline. This was accomplished by the addition of a small amount of pure ammonia. This alkaline solution was transferred to a glass stopped bottle, and again shaken with petroleum ether, which is a very light benzine. The petroleum ether was again separated from the aqueous alkaline solution, and was evaporated to dryness in several watch glasses. On evaporation it left a white crystalline deposit, which deposit was tested for alkaloids. The said deposit gave every reaction for strychnine.

The first test applied was by means of concentrated sulphuric acid and bi-chromate of potash, which gave a strychnine reaction. The concentrated sulphuric acid gave a colorless solution, which, on the addition of bi-chromate of potash, turned to a violet blue, which quickly changed to a red. The red color, after several hours, disappeared. The process thus described was the test reaction for strychnine; but other tests were applied. The next test was the addition of a drop or two of concentrated sulphuric acid, and the subsequent addition of a small crystal of black oxide of manganese. This gave a similar reaction to that given by bi-chromate of potash and sulphuric acid. The crystal of black oxide of manganese was removed from the liquid, and five or six drops of water were added; and then pure ammonia was added nearly to the point of saturation (neutralization.) The liquid became of a purple color. A further addition of ammonia to an alkaline reaction gave a greenish yellow color. This is also a distinctive test. A fourth test was made by dissolving some of the residuum on the watch crystals in water, after having changed it to sulphate. In connection with Doctor Wooten, of Austin, witness took two or three drops of this solution and made a sub-cutaneous injection into the body of a frog. Within about five minutes the frog manifested every symptom of poisoning by strychnine. Its limbs became rigid; it had violent spasms and it threw itself on its back, with its four legs distended in spasms. These constituted the tests that were applied. Every vessel used and every chemical agent employed by the witness, was either purified by him or its purity tested by him. A pair of watch crystals were exhibited to this witness at this stage of the testimony, and he declared that they con-

tained strychnine, and that that strychnine was taken by him from the stomach delivered to him by W. D. Adair on April 10, 1886. About one grain of strychnine was taken by the witness from the said stomach. Strychnine, in cases of strychnine poisoning, is not only found in the stomach, but also in the liver, blood and intestines, and sometimes, even several days after death, in the urine. There is no fixed proportion as to the relative quantity of the poison that will be found in the several organs above mentioned. The witness, in the presence of Doctors Gambrell and Prince, analyzed a paper of medicine delivered to him by Doctor Gambrell, and found it to be quinine.

Cross examined, the witness testified that he received the degree of Ph. D. at the University of Freiburg, Germany. His analysis of the stomach delivered to him by Adair included search for other alkaloids than strychnine. The distinctiveness of the strychnine crystals depends upon the rapidity of the evaporation of the solvent. The base strychnine is practically insoluble in cold water; slightly soluble in alcohol, and quite soluble in petroleum ether or benzine. The tests used by witness in searching the stomach for strychnine were such as he would use in looking for strychnine alone. The tests mentioned by counsel for the defense were called general tests, and were used in searching for other alkaloids as well as strychnine. Witness did not test the stomach for the presence of quinine, and could not say whether it contained any quinine or not. Strychnine would not turn the color of coffee, inasmuch as the application of coffee to strychnine would not produce any kind of reaction. The tests applied by the witness, in this case, were the latest and the most approved by science, and left no possible doubt as to the presence of strychnine in the stomach. Witness observed some particles of rice among the contents of the stomach, but saw no pickle that he could remember. He, however, was not prepared to testify that the stomach did not contain pickle, as he did not look for any. Strychnine would be more soluble in pickle because of the acids, but witness could not say to what degree pickle will absorb strychnine. The only difference between the solubility of strychnine when subjected to the action of water or of coffee is that coffee is usually warm when drunk. Cold coffee would have no greater effect upon strychnine than water.

E. T. Josey was the next witness for the State. He testified that, early on the morning of Mrs. Roe's death, the defendant

came into his office and wrote some letters. When he left the office after writing the letters, he called to some one, in the hearing of the witness, and asked if that person then knew where Lewis Cotton was.

Willie Josey testified, for the State, that between eleven and twelve o'clock, on the fatal day, he saw the defendant and Lewis Cotton together, on the streets of Huntsville, between the opera house and Bennett's store. He had no recollection of seeing either of said parties at any other time or place on that day. Defendant asked witness if a certain colored man named Bookman left Huntsville on that morning's train, and witness told him that he did. When first seen by witness on that occasion, the defendant and Lewis Cotton were standing close together, at the opera house fence, and witness presumed that they were talking.

Ann Travis testified, for the State, that she was the proprietress of a restaurant in Huntsville. Lewis Cotton came into the witness's restaurant about twelve o'clock on the fatal day, and went to his overcoat, which was then hanging behind one of the doors in the restaurant. Ann Derry was not then in the witness's house. Witness never said anything to Lewis Cotton which could be tortured into an intimation that Ann Derry got the strychnine out of his overcoat pocket. Cotton never said anything to witness about having lost any strychnine out of his pocket. Neither Ann Derry nor any other person could have gone to Cotton's overcoat and removed anything from the pockets thereof, on that day, without the knowledge of the witness. Lewis Cotton alone went to his overcoat on that day. Ann Derry left witness's restaurant on the fatal day, to go to defendant's house, before Cotton came there.

Rosa Nelson testified, for the State, that she was a sister of the States' witness Anna Derry. The said Anna came to witness's house, where she lived, before twelve o'clock on the fatal day, laid down across the bed and soon went to sleep. When the penitentiary whistle blew for noon she got up, put on her bonnet and apron and left, saying that she was going to the defendant's house.

T. P. Robinson testified, for the State, that he lived in the town of Huntsville, and was the proprietor of a drug store situated in that town. On the night of April 6, 1886, that being the night of the day on which the municipal election was held, the witness sold to the defendant one dose of calomel and Dovers

powders, in two separate powders, and two doses of quinine in two separate powders. It was about seven o'clock p. m. when the defendant bought the said medicine. The medicine was wrapped up in paper somewhat similar to that in evidence. The papers in which the doses of quinine was wrapped contained no other medicine. Both of the doses of quinine sold by witness to defendant were taken from a bottle then about half full of the medicine. Witness took the two doses out of the bottle at once, and then divided and wrapped them up in separate papers. Witness marked one of the doses with two upright parallel lines intersected at the middle by a horizontal line, and the defendant marked the other with a cross. Witness identified the piece of paper in which the dose of quinine in evidence was wrapped as the wrapping of one of the doses of quinine sold by him to the defendant on said night. He recognized the mark on it as the mark he placed on it at the time he gave it to the defendant. Defendant had not bought any medicine from the witness for three weeks prior to that time, and none since. The calomel and quinine were wrapped in paper of the same kind, and witness thought that the marks were intended to distinguish the quinine from the calomel. Two perpendicular marks appear on the paper marked by witness, by reason of the fact that the line he drew appeared dim to him, and he drew another.

City Marshal Gus Oliphant testified, for the State, that, just before twelve o'clock on the fatal day he saw the defendant and Lewis Cotton standing together and talking to each other near the opera house steps, and between the opera house and Bennett's store.

John Frame testified, for the State, that he lived in the city of Houston, Texas. He saw the defendant in that city in February or March, 1886. He then said that Lewis Cotton was "broke," and was trying to raise some money on a gold necklace. Witness did not know whether he succeeded or not.

Jeff Kelly testified, for the State, that he was the brother of the deceased. She stayed at his house for the three weeks next preceeding the municipal election, and returned to her home in town on the evening of that day, which was April 6, 1886. She was sick during the last week of her stay at witness's house. Defendant spent his nights at witness's house, while his wife was there, but his days in town. He was a candidate for city marshal, and occupied his time electioneering. In going from the witness's house to town the defendant had to pass Captain

McCulloch's office. Captain Adair and witness, after the death of Mrs. Roe, searched Roe's premises for strychnine. Witness searched the kitchen. He emptied the coffee pot and examined the liquid which remained and also the grounds. He took the ashes from the stove and sifted them, but found nothing of a suspicious character. Lewis Cotton was an old servant of the witness's family. Ann Derry waited on Mrs. Roe during the three weeks she was sick at witness's house, and was very kind and attentive to Mrs. Roe.

Sam Flood testified, for the State, that on the day of Mrs. Roe's death Ann Derry came to where he and Lewis Cotton were standing and, speaking to some person present, said that Mrs. Roe was dead. Cotton then asked witness to go with him to Roe's house, but witness declined.

W. D. Adair testified, for the State, that he was sheriff of Walker county at the time of Mrs. Roe's death. A post mortem examination of the body was had by order of the coroner at the time of the inquest. The stomach was removed from the body by Doctors Oliphant and Prince, who sealed the same and delivered it to the coroner's jury in the presence of the witness. It was then delivered to the witness by the coroner's jury, and was by him taken to the city of Austin, and on the tenth day of April, was delivered by the witness to Professor Edgar Everhart of the University of Texas. When delivered by witness to Professor Everhart, it was in the same condition in which the witness received it from the coroner's jury. Nothing whatever went into or came out of the jar in which the stomach was placed, after it was sealed by Doctors Prince and Oliphant, so long as the same was in the custody of the witness.

On his cross examination this witness said that before the doctors were called in, and before the inquest was concluded, he suggested to the defendant the propriety of a post mortem examination, and defendant replied at once that he would leave that matter entirely to the discretion of the witness; and something to the effect that if the doctors thought that death was attended with symptoms indicating the presence of poison a post mortem examination should be had. Witness was present when defendant was before the coroner's jury, but could not now recall that any member of the jury asked defendant anything about a post mortem examination. Defendant was not under arrest at the time of the conversation about the post mortem examination, nor at the time the witness left for Austin with the stomach.

This witness being recalled by the State, testified that he had a second conversation with the defendant on the same day.   During that conversation he asked defendant if he knew that, according to rumor, Lewis Cotton had purchased some strychnine on the day that his wife died.   Defendant replied he was ignorant of the report, and asked if it was true that Cotton did buy some strychnine on that day.   Witness then asked defendant if Lewis could have a motive to injure him or his family by the administration of poison.   Defendant replied that he did not believe that Lewis could be induced to do such a thing.   Witness then asked if there was any body else about defendant's house prior to and at the death of his wife.   He replied that no one except Annie Derry was there.   Again cross examined, the witness said that he had a conversation with Lewis Cotton on the street on the night of the fatal day.   He made a second demand for the bottle of strychnine which Lewis had bought on that day of druggist Cotton.   Lewis replied that he had been unable to find the bottle, and that he "wished to God that he could find it."   He then reiterated his previous statement to the witness, to the effect that he placed the strychnine in the pocket of his overcoat as it hung in Ann Travis's restaurant, and that it was stolen from that pocket by some one.   He said that Boy Cotton and Alfred Cephas, who were under engagement to go hunting with him, knew that he was going to purchase strychnine for the purpose of killing wolves.   The witness then told Lewis Cotton that the bottle of strychnine that he purchased on that morning must be accounted for, and that it must be produced with the seal unbroken.   About that time the witness saw two women coming down the street near Bradley's saloon.   Lewis Cotton left, and went in the direction from which the women were coming, so that he would meet them somewhere near Bradley's saloon.   Witness then got Ed Marklam and G. B. Oliphant to consent to go to the country at once, find Boy Cotton, Lewis's brother, and ascertain if, as stated by Lewis, it was true that he was under engagement to go hunting with Lewis, and knew that Lewis was to purchase strychnine with which to kill wolves.

Re-examined by the State, the witness said that when he returned from Austin he asked Lewis why he did not at first tell him the truth about the bottle of strychnine he bought.   He replied: " Mr. Adair, I tell you I was afraid to do so.   I sent word to you by Mr. Smith Hume to come to see me, and if you had come then I would have told you all about it."   When Cotton

described a certain handkerchief to the witness the witness searched the trunk of Ann Derry and found a handkerchief which corresponded with that description, except that it lacked the hole in the corner mentioned by Lewis. Witness threw that handkerchief into Ann Derry's lap, but she did not appear to recognize it. The State rested.

William Bradley was the first witness for the defense. He testified that, at about half-past eleven o'clock on the fatal morning, the defendant and Lewis Cotton came into witness's saloon, and, after taking one or two drinks, went into the back yard, where they entered into a conversation. Defendant appeared to make some kind of a calculation, after finishing which he asked Lewis: "Is that all?" and Lewis said: "Yes." The impression made upon the mind of the witness was that defendant was figuring up the amount that he owed Lewis for expenses incurred by him during the canvass for city marshal. The witness fixed the time only by the fact that his clerk was not in the saloon when defendant and Lewis came in, and he usually left the saloon at half-past eleven and returned at half-past one.

Miss Kate Cox, the aunt of the defendant, testified, in his behalf, that she was present at the death of Mrs. Roe. Ann Derry was also present, and appeared to be very much excited. She told witness that Mrs. Roe got the medicine she took from the mantelpiece, where it and another powder lay, and she showed the witness the spoon from which she took it. Defendant, who had always been a tender, kind and affectionate husband to Mrs. Roe, appeared to be very much grieved and distressed by her death.

Lewis Cox, the uncle of the defendant, testified, in his behalf, that he had known defendant since his infancy, and knew his wife since her marriage to the defendant. Witness was present when Mrs. Roe died. Defendant appeared to be very much affected and grieved by her death. Defendant and his wife always appeared to love each other very much, and to be happy in their married life. Witness saw Dock Bennett in the Gibbs garden on the occasion stated by Bennett in his testimony. Bennett told witness that it was not true that he took a message to Lewis Cotton from Roe; that it looked like Cotton was trying to involve him in the mystery of Mrs. Roe's death, but that he, Cotton, was a liar. Witness had a conversation with Lewis Cotton in the barber shop at the time stated by Cotton, but witness did not, there nor elsewhere, at that or any other

time, say anything to the said Lewis about "sticking to the family," or "going back" on the family. He did say something to said Lewis about having known the family a long time, and did advise him to adhere to the same story, but gave him that advice only because he had told him, witness, one story about it and John Varnedore and Doctor Gambrell another. Witness's remark to Lewis, that he had known the family a long time, was induced by the fact that he did not then believe that Mrs. Roe had been poisoned and did not believe that Lewis could be induced to poison her. What the witness said to Captain McCulloch about the payment of the insurance policies was said by him as a member of the lodge, and reflected his interest only as a member of that lodge, and not because he had (which he did not have) a direct or indirect pecuniary interest in the said policies. Witness told Lewis Cotton that, in his opinion, congestion was the cause of Mrs. Roe's death. It was his impression that he told Captain Adair that Mrs. Josey and Captain Kelly opposed a post mortem examination of the body of Mrs. Roe. The witness had been so informed, but Captain Kelly subsequently informed the witness that he was not and had never been opposed to a post mortem examination of the body. The witness reached the conclusion that Mrs. Roe's death was the result of poison on the night of the fatal day. Thenceforward he neither advised nor opposed the post mortem examination. Defendant and one of his children slept together at the witness's house on the night of the fatal day; and witness saw the defendant in bed at intervals until some time between eleven and twelve o'clock, and if defendant left the house on that night, the witness did not know it.

Mrs. Varnedore testified, for the defense, that she reached the defendant's house a few minutes after the death of his wife. Witness saw Ann Derry at the house. Ann appeared very much excited and told witness that she cautioned Mrs. Roe that if she ate certain pickles she would die. Defendant appeared to be very much grieved by the death of his wife. When witness reached his house he was sitting on his steps, with his arm around his little son, weeping.

Doctor U. Haynie testified, for the defense, that he was a physician of thirty years experience. Strychnine and quinine could be readily distinguished by taste. Both had a bitter taste, but were different in other flavor. If mixed, in equal quantities, the quinine taste would predominate over that of the strych-

nine. Strychnine is not soluble in coffee unless very finely pulverized, and even then particles of strychnine would remain in a vessel after the coffee was drained off.

Sol Jones testified, for the defense, that, at about nine o'clock on the morning of, or on the morning after, Mrs. Roe's death, he saw Lewis Cotton going towards the defendant's residence. Witness was satisfied in his own mind, but would not solemnly swear, that it was on the morning of the fatal day, and not the morning after. Sylvia Mason testified, for the defense, that on the morning of the fatal day, she saw Ann Derry talking to George Ross in front of the bakery. Sheriff Black of Madison county testified, for the defense, that on the former trial of this case, in Madison county, Ann Derry testified that she advised Mrs. Roe not to eat pickles after taking the dose of medicine furnished by defendant, as they would kill her.

Miss Kate Cox, re-called, testified, for the defense, that Mrs. Josey, a relative of the defendant, told her that she was opposed to a post mortem examination of the body of the deceased, as the result of it might create suspicion against innocent parties, and witness informed Lewis Cox of Mrs. Josey's statement. Captain Hunter, the defendant's uncle, testified that Mrs. Josey told him that she was opposed to a post mortem examination of the dead body of Mrs. Roe. Witness favored such examination from the first. Defendant was a kind and affectionate husband to Mrs. Roe, and lived happily with her.

The defense closed.

Captain Jeff Kelly, Mrs. Roe's brother, testified, for the State, in rebuttal, that he favored a post mortem examination of the body from the first, and so informed Mr. Cox.

The motion for new trial raised the questions discussed in the opinion.

*J. M. Maxey* and *Earle Adams* filed an able brief for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. Appellant was indicted for the murder of his wife by poison. There were two changes of venue in the case—the first at defendant's instance and based upon both the grounds mentioned in the statute. (Code Criminal Procedure, art. 578.) The second was at the suggestion of the de-

fendant, but upon the court's own motion, on the ground of undue excitement of the public mind and attempted mob violence in Madison county (to which the venue had first been changed), rendering it probable that a trial alike fair and impartial to the accused and the State could not be had in said county. On October 31, 1887, the cause was brought to trial in the district court of Grimes county to which the venue had thus finally been changed, and the result of the trial was defendant's conviction of murder of the first degree and his punishment assessed at death.

The record is voluminous, containing over a hundred pages of closely written matter, and it shows that the case was earnestly and hotly contested by the able and zealous counsel engaged on both sides, and yet there is not a single bill of exception reserved by the defendant to any ruling of the court; and no exception was saved to the charge of the court, and no special instruction requested for defendant. The motion for a new trial contained eight separate grounds of supposed error. It was overruled, and the learned trial judge has given in a writing embodied in the transcript his reasons *seriatim* for the several rulings complained of.

These supposed errors are objections relating chiefly to certain portions of the charge of the court. As stated above, the charge of the court was not excepted to. In such a state of case, in order to avail of error in the charge, on a motion for a new trial, it must appear that "the court has misdirected the jury as to the law, or has committed any other material error calculated to injure the rights of the defendant." (Code Criminal Procedure, art. 777, sub-division 2.) A charge clearly erroneous, though objected to for the first time on appeal in this court, will constitute cause for a reversal if it relates to a material matter, and was calculated to mislead the jury to the defendant's injury. (Bishop v. The State, 43 Texas, 390.) The true rule, as now recognized and settled by this court, is that, "if there was a material misdirection of law applicable to the case, or a failure to give in charge to the jury the law which was required by the evidence in the case, and such error or omission was, under all the circumstances of the case, calculated to prejudice the rights of the defendant, this court should for either cause reverse the judgment." (Elam v. The State, 16 Texas Ct. App., 34; Lewis v. The State, 18 Texas Ct. App., 401; Hart v. The State, 21 Texas Ct. App., 163; Leache v. The State, 22 Texas, Ct. App., 280;

Smith v. The State, Id., 316; Jackson v. The State, Id., 442; Cook v. The State, Id., 511.)

Let us apply these tests to the particular portions of the charge complained of in this case. In the fifth paragraph the instruction is : "What counsel on either side may say in the course of argument, as to their personal belief in the guilt or innocence of the defendant, is not in any degree evidence, and as such will be entirely disregarded by you, and you will try the defendant wholly by the law as given you in this charge, and by the testimony admitted to go before you, *and allow nothing else to influence you in finding your verdict.*" We have italicised the portion which is the subject matter of complaint. It is insisted that to instruct the jury thus was equivalent to telling them that they should pay no regard whatsoever to the arguments made by counsel in behalf of the defendant, and contravened the tenth section of our Constitutional Bill of Rights, which guarantees to an accused in all criminal prosecutions "the right of being heard by himself or counsel or both."

Mr. Cooley says : "With us it is a universal principle of constitutional law that the prisoner shall be allowed a defense by counsel." (Cooley's Const. Lim., 4 ed., p. 412.) "At *nisi prius* trials the right of being heard can not be denied the accused. In Wood v. The Commonwealth, 3 Leigh (Va.), 805, it was held that upon the trial of a question of fact in a criminal case the accused has the right to be heard by counsel before the jury, and the court has no right to prevent him from being heard, however simple, clear, unimpeached and conclusive the evidence in its opinion may be." And in The People v. Keenan, 13 Cal., 581, the court say : "It is unquestionably a constitutional privilege of the accused to be fully heard by counsel." (Tooke v. The State, 23 Texas Ct. App., 10.)

"It is said that every party to a trial, civil or criminal, has the legal as well as natural right to be heard in his own cause by himself or counsel, and no rule of practice can deprive him of this right if at the proper time and in the proper way he offers to exercise it. (Sedonsky v. McGee, 4 J. J. Marsh., Ky., 271.) Another court has said that a party to a civil action has a right to be heard, not only in the testimony of his witnesses, but also in the arguments of his counsel. It matters not how weak and inconclusive his testimony may be, if it is enough to present a disputed question of fact upon which he is entitled to the verdict of the jury, he has a right to present, in the arguments of his

counsel, his view of the case.   This is no matter of discretion on
the part of the court, but an absolute right of the party."
(Douglas v. Hill, 29 Kansas, 527.)   *  *  *  *  *  *  "In *criminal*
*cases,* the right of accused persons to be defended by counsel is
a right of a very high nature, which is guaranteed by the Con-
stitution of the United States and by the Constitutions of most
of the States.   Under these constitutional guaranties it is the
unquestioned right of every person tried upon a charge of crime
to be heard by the court and jury through the lips of counsel
learned in the law upon the whole case."   (9 Crim. Law Mag.,
pages 612, 614.)

In a civil case this identical question came before the Supreme
Court of Georgia, and because the views, language and conclu-
sions of that court are, in our opinion, worthy of all approval,
we reproduce what was said by Nisbet, Judge, on the subject.
He says: "The court further, as we have seen, charged the jury
that, in determining this question, they were not to look to the
argument of counsel.   Upon this subject we can lay down no
precise rule.   In a very significant sense they must look to the
argument of counsel.   Parties have a right to be heard by coun-
sel, and it is the privilege of counsel to address the jury on the
facts.   If the jury are to disregard the arguments of counsel
altogether—if they are to shut their eyes to their illustrations,
comments and reasonings—how unmeaning, indeed how absurd,
is the appearance of counsel.   It is a most valuable right to be
represented by learned and eloquent counsel, not only before
the court as to the law, but also before the jury as to the facts.
It means something; it is a guarantee against the encroach-
ments of power upon the personal rights of the citizen.   It is, in
this country, no mean privilege.   So far as the facts in the case
are concerned, the privilege is valuable just because the jury may
look to the argument of counsel—may consider his reasoning be-
fore making up their verdict.   I do not suppose that the judge,
in this instance, intended to instruct the jury that they should
not listen to and avail themselves of the aid of the argument of
counsel in coming to a decision in this case; he meant that the
argument of counsel should not be to them a basis of decision.
He meant to say that the statements and inferences of counsel
are not the criterion of their judgment, but that the evidence is.
In this view of the charge, it is not at all objectionable.   The
true view of the position of counsel before the jury is that of
aids or helps.   *  *  *  *  *   His business is to comment on the

evidence—to sift, compare and collate the facts—to draw his illustrations from the whole circle of the sciences—to reason with the accuracy and the power of the trained logician and enforce his cause with all the inspiration of genius and adorn it with all the attributes of eloquence. It is the business of the jury to listen, to be informed, but not to obey. They sit the sworn arbiters of the cause, bound by the most solemn sanctions, to do justice between the parties *according to the evidence.*" (Garrison v. Wilcoxon, 11 Georgia, 154.)

A very nice and most serious question would have been presented in the case we are considering had this portion of the charge been specially excepted to. This, however, was not done, and the question is, was it calculated, under the facts and circumstances of the case, to injure the rights of defendant. In view of the explanation made by the learned judge, we think not. He says: "As to denying the right to be heard by counsel, I allowed four counsel to speak for the defense—all that asked—and gave them unlimited time, the four aggregating seven hours."

It is strenuously insisted that serious injustice was done the defendant in that portion of the sixth paragraph of the charge contained in the words: "The facts of any case may be established either by direct or circumstantial evidence, and in so far in this case as circumstantial evidence is relied on to convict," etc. The contention is that the language "in so far in this case as circumstantial evidence is relied on to convict" intimated to the jury that, in the opinion of the court, there was direct evidence of defendant's guilt, and that the jury were doubtless thereby misled and influenced prejudicially to defendant's rights. This charge was not excepted to. Viewing it in connection with the other portions of the charge and with the evidence, we can not say it was unwarrrated, misleading, or calculated to injure the rights of the accused, or a charge upon the weight of the evidence.

Again, the tenth paragraph of the charge is claimed to be unjust, unwarranted and prejudicial to defendant in that it told the jury that "the defense alleges in this case that if Jennie Roe was murdered by poison, as alleged, that the witnesses Ann Derry and Lewis Cotton stand to such crime in the relation of accomplices;" whereas, on the contrary, defendant's counsel alleged nothing of the kind, but claimed that Ann Derry and Lewis Cotton were themselves the principals in the crime, and that the defendant had no hand in it. It is claimed that the charge directed

the mind of the jury to the defendant as the principal. This
portion of the charge was not excepted to. Under the facts of
the case as developed by the evidence it was the bounden duty
of the court, as was done in all the varied phases presented, to
charge the jury fully the law of accomplices, accessaries and
*participes criminis.* If not *"alleged"* by defendant, still the evi-
dence required that the jury should consider the relationship of
Derry and Cotton to the murder,—both of whom defendant was
endeavoring to implicate in the crime as principals,—and, if not
principals, then to determine their complicity, if any, and, if
they were *participes,* then the necessity for corroboration of
their testimony. Taking the whole of the charge, together with
the evidence on this phase of the case, and we are unable to de-
clare that prejudicial or reversible error has been committed in
this particular. (Coleman v. The State, 44 Texas, 109.)

Objections urged to other portions of the charge are, in our
opinion, without merit, and therefore will not be discussed, and
especially so in view of the fact, repeatedly stated, that no ex-
ceptions were reserved to the charge. Over and above the ques-
tions already discussed relative to it, in our opinion the charge
was a full and explicit exposition of the law, and so presented
as carefully to guard and protect all the material rights of the
defendant in connection with the evidence.

One or more complaints are made to evidence which was per-
mitted to be introduced. There is no bill of exceptions saved to
any evidence introduced on the trial, and the record fails to show
even that any objection was made to the introduction of any of
the evidence. "The action of the court below in receiving al-
leged incompetent evidence is not reversible by this court in the
absence of a bill of exceptions (in the statement of facts or sep-
arately), showing that such evidence was objected to when it
was first offered." (Conner v. The State, 17 Texas Ct. App., 1.)

A last ground of contention upon part of the appellant is that
the evidence does not sustain the verdict and judgment. On the
contrary, it is claimed that they are against the evidence. To
this we can not agree. The evidence is amply sufficient if the
State's witnesses are to be believed, as it seems they were, both
by the jury and the judge presiding at the trial. If they are to
be credited in their statements, then those statements and sur-
rounding circumstances establish a case against defendant en-
tirely free of any reasonable doubt. In so far as we can see,
defendant's trial was a fair and impartial one, and by a jury

presumably free from all chances of having been biased or pre-
judiced against him. He has been defended by learned, skilful
and distinguished counsel. We have listened to their able argu-
ments and have maturely considered their able briefs in his be-
half. We have examined the record most carefully in the light
of the argument and briefs, and our deliberate conviction is that
no error has been shown of sufficient magnitude to justify us in
setting aside the verdict and judgment which condemns this ap-
pellant to death. If guilty, no punishment is too severe for one
who wilfully, deliberately, and with malice aforethought, could
take the life of his own innocent and confiding wife, by means
of poison, and that, too, when actuated solely by the motive to
obtain the paltry sum for which her life was insured. If guilty,
this appellant's case is totally without the slightest extenuating
circumstance to palliate its enormity.

The judgment is in all things affirmed.

*Affirmed.*

Opinion delivered February 20, 1888.