## BILL LUCAS et al. v. STATE.

No. A-4869.   Opinion Filed Jan. 14, 1924.

(221 Pac. 798.)

(Syllabus.)

1. **Evidence—Confessions Induced by Promise or Threat Inadmissible.** Confessions induced by a promise of benefit or a threat of harm made to a defendant by a prosecuting attorney or an officer having him in custody will be deemed involuntary, and will be inadmissible in evidence.

2. **Same—Competency of Confession Determined by Court in Absence of Jury—Right to Have Evidence Regarding Confession to Jury.** Where the competency of a confession is challenged on the ground that it was not voluntary, its admissibility as evidence is primarily a question for the court, which should be determined by the court in the absence of the jury; but the defendant is entitled to have the evidence in regard to the facts and circumstances under which the confession was made given anew to the jury—not for the purpose of permitting the jury to pass upon its competency, but for the purpose of enabling it to judge what weight and value should be given to it as evidence. The jury may disregard it if they are not satisfied that the confession was voluntarily made.

3. **Appeal and Error—Witnesses—Denial of Right of Cross-Examination of County Attorney Called as State's Witness Erroneous**

—Error Cured by Accused Calling Him as Own Witness. When the state calls the county attorney as a witness, he is subject to the same rules as any other witness, including the right of the defendant to cross-examine. A denial of this privilege is error, but the error is cured by the defendants' making the county attorney their own witness and interrogating him at length upon the question of whether the confession was voltary and going into all the details that might have been brought out upon cross-examination when he was the state's witness.

4. Evidence—Voluntary Confession not Rendered Inadmissible by Failure to Warn Accused Under Arrest nor by Fact that Questions Propounded Assumed Guilt. The fact that the defendants were under arrest and were not warned that any statement made by them might be used against them would not alone render any voluntary statement made by them inadmissible; neither would the fact that the questions propounded assumed that they were guilty, nor the fact that the officers told it would be better for them to tell the truth.

5. Third Degree Methods Discussed. The practice of "sweating" the accused, or applying what is known as the "third degree," to procure confessions, is discussed in the opinion.

Appeal from District Court, Texas County; Arthur G. Sutton, Judge.

Bill Lucas and another were convicted of conjoint robbery, and they appeal. Affirmed.

F. Hiner Dale and John L. Gilson, for plaintiffs in error.

The Attorney General and J. Roy Orr. Asst. Atty. Gen., for the State.

BESSEY, J. The plaintiffs in error above named, here referred to as the defendants, were by information filed in the district court of Texas county on May 17, 1922, charged with the crime of conjoint robbery, in that they willfully and with force and threats took from the person of Otis Turner certain money and other property. They were found guilty as charged, and the punishment of each fixed at five years' imprisonment in the state penitentiary. From the judgment of the trial court they appeal.

Texas county is one of the western counties of Oklahoma, being a part of what is known as the Panhandle, bounded on the south by Texas and on the north by Kansas, and traversed by the. Rock Island Railway from Texhoma on the Texas border, diagonally across the county to Liberal, Kan., just over the border, passing through Guymon, the county seat, located near the center of the county.

Otis Turner, the person alleged to have been robbed, was a resident of Liberal, Kan., and was a traveling salesman for Swift & Co. He visited various towns in Texas county, making his rounds by automobile and selling to the merchants meats, canned goods, and other products put out by Swift & Co.

On the 2d day of May, 1922, there was a public dance held at Texhoma, on the Texas side of the town, and Otis Turner attended this dance. At this time there resided in Guymon a woman whose name was Frances Smith and who was employed as a waitress in a cafe there. She occupied rooms in the same house with these defendants, both of whom were married men living with their wives in this house, along with other roomers. On the evening preceding the dance at Texhoma Frances Smith boarded the train and went to Texhoma, where she also attended the dance. During the progress of the dance, near midnight, Frances Smith inquired of Otis Turner whether he intended to drive through to Guymon after the dance, and, if so, whether he would permit her to ride with him. Turner replied that he would not know until the dance was over. After the dance, about 2 o'clock of the morning of May 3d, Turner went to a restaurant on the Oklahoma side of Texhoma, and as he came out he again met the Smith woman, who asked permission to ride with him to Guymon. Turner told her she might, provided she could drive the car. The Smith woman said she

could do that, and they both got into the car and with the woman driving proceeded along the Atlantic and Pacific Highway towards the town of Guymon. At a point about three-fourths of a mile from Texhoma two highwaymen appeared, stopped the car and at the point of a pistol forced Turner to get out of the car onto the ground and hold up his hands while the highwaymen took from him a bill-fold containing $5 in money, together with a ticket for a prize fight at Guymon and a check, issued to Turner by Swift & Co., of the amount of $94.52. Turner and the Smith woman then proceeded to Guymon, where they drove to the residence of the defendants, arriving there between 3 and 4 o'clock that morning.

Turner was probably in an intoxicated condition, and there was some disturbance at the home of the defendants. At the trial defendants offered to show that Turner was highly intoxicated and sick from overindulging in liquor and had to be assisted into his car. After Turner left this place he drove on into Liberal, where he later notified the officers that he had been robbed. Turner was unable to identify the robbers, but for some reason the officers suspected the Smith woman and that the defendants were implicated. All three were taken to the county attorney's office and were put through a process of "sweating."

The Smith woman was given her liberty and she boarded a train for Kansas. After questioning the defendants together and separately, the county attorney and the sheriff both stated to them that they believed that they were guilty and that it would be better for them to confess and "come clean," and that they could use their evidence in prosecuting the Smith woman whom they believed to have been the instigator of the crime. One of the defendants then made a confession, to the effect that the Smith woman had suggested

that she should go to this dance and procure some one who appeared to have money to take her from Texhoma to Guymon after the dance, and that after making such arrangements she would communicate with the defendants and they could rob her victim on the way to Guymon; that the Smith woman boarded the train in the usual manner, and they rode the blind baggage from Guymon to Texhoma; that after the Smith woman made the arrangement with Turner she told them to proceed out along the Atlantic and Pacific Highway and that she and Turner would drive along a little later; that pursuant to this arrangement they did proceed along the highway toward Guymon until the Smith woman and Turner appeared, when they robbed Turner at the point of a pistol furnished them by the Smith woman. After they had recited these details the county attorney and the sheriff wanted to know what had become of the pistol and the billfold containing the money and the check. The defendants told the officers where these articles were, and at the suggestion of the officers went out and procured them and brought them back to the county attorney's office. The articles were produced in evidence at the trial and identified by Turner.

The defendants claim that the confession made was not voluntary, made by them while they were in custody of the officers, and that the officers by their statements led them to believe that they would be used as witnesses in the prosecution of the Smith woman, and that the confession or statements made by them would not be used in evidence against these defendants. The prosecuting attorney and the sheriff both denied that any inducements were held out or promises of immunity made to the defendants to procure this confession.

The defendants objected to the introduction in evidence of the confession or statements made by them to the county attorney and other officers on the ground that whatever statements were made were induced by promises of immunity. The jury were thereupon excused, and in the absence of the jury the county attorney and the officers were interrogated concerning the confessions, to ascertain whether or not they should be admitted as competent testimony. The examination of the county attorney at this time disclosed the following:

"I told them that if they would testify against Frances Smith in the case in the district court the state would continue their case over that term of court. * * * I don't believe I ever would tell an individual that would 'be lighter' on them. The only thing I tried to convey to them was that it would be a whole lot better for them. I am quite sure I did not use the word 'lighter.' That it would be a whole lot better for them to tell the truth; that nobody would be willing to help them when they were convinced they were guilty and then for them to say they were not guilty—I told them that. I told them it would be better for them to tell the truth."

The county attorney also stated that he presumed he had their confidence.

The court found, as a matter of law, that the confessions made were competent. The officers and the county attorney were then permitted to testify in the presence of the jury concerning the confessions made, and what defendants said concerning the crime. Counsel for defendants, in an effort to cross-examine the county attorney, brought on the following:

"Q. Now, Mr. Adams, when you obtained these statements from these young men what was the conversation you had with them before they made the statements relative to the—to this girl?

"By Mr. Sweet: We object, if the court please.

"By the Court: We have settled that issue.

"By Mr. Dale: I understand; I just wanted to bring out what the statement was, the preliminary statement.

"By the Court: All right, unless it touches that feature we have already settled.

"By Mr. Dale: I am objecting to the—

"The Court: You are not objecting, you are trying—

"By Mr. Dale (interrupting): I think we have a right for the jury to have the whole conversation.

"By the Court: Well, he can state the whole conversation that is pertinent to the matter he has just testified about, but not any issues that we have settled. You asked that the jury be excused so that we might settle that and they were excused.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"Q. Now, did you make any statements as to what would be best for the boys—

"By Mr. Sweet (interrupting): We object, if the court please.

"By the Court: Sustained.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"Q. Were any statements made to these boys, in regard to their evidence in another trial, as to them being witnesses in another trial by the state against Frances Smith?

"By Mr. Sweet: We renew our objection, if the court please.

"By the Court: You had better make a new one.

"By Mr. Sweet: We object to that on the same grounds.

"By the Court: Sustained.

"By Mr. Dale: Exception."

It is well established in this jurisdiction that extrajudicial confessions, or those which are made by the defendant out of court, whether to an official or a nonofficial person, in order to be admissible in evidence must be entirely free and voluntary. It was held in the case of Mays v. State, 19 Okla. Cr. 102, 197 Pac. 1064, that confessions induced by a promise of benefit or a threat of harm made to a defendant by a prosecuting attorney or an officer having him in custody will be deemed involuntary and will be inadmissible as evidence, and that where the competency of a confession is challenged on the ground that it was not voluntary, its admissibility as evidence is primarily a question for the court, which should be determined by the court in the absence of the jury, but that the defendant is entitled to have the evidence in regard to the facts and circumstances under which the confession was made given anew to the jury—not for the purpose of permitting the jury to pass upon its competency, but for the purpose of enabling it to judge what weight and value should be given to it as evidence— and the jury may disregard it if they are not satisfied that the confession was voluntarily made.

Applying these principles of law to the facts here, it will be seen that the court erred in not permitting the defendant to cross-examine the county attorney relative to the disputed question of whether or not the confession was voluntary. Where the facts on that issue are conflicting, it is primarily for the court to determine whether it is admissible, but ultimately it is a question for the jury to determine whether it is indeed and in fact voluntary or involuntary.

Further, when the state calls the county attorney as a witness, he is subject to same rules as any other witness, including the right of the defendant to cross-examine. However, in this case this error, grave as it was, was cured by the

defendants' making the county attorney their own witness and interrogating him at length upon the question of whether the confession was voluntary, going into all the details that might have been brought out upon cross-examination when he was the state's witness.

The courts are not in entire accord as to statements made by persons accused of crime while in custody of officers. The practice of "sweating" suspects, or putting them through the "third degree," is susceptible of grave abuses. The courts have regarded this practice from three points of view: First, those who consider the practice so reprehensible that any statement so obtained should not be given in evidence; second, those that hold that, while such practice of interrogating witnesses is undesirable and should not be encouraged, yet the answer so obtained cannot be rejected; and, third, those holding that such practice might be so conducted as to be useful and even desirable in the furtherance of justice. The practice in our courts is to avoid either extreme.

The fact that the defendants were under arrest and were not warned that any statement made by them might be used against them would not affect the admissibility of any voluntary statement made by them; neither would the fact that the questions propounded assumed that they were guilty, nor the fact that the officers told them it would be better for them to tell the truth. The policy of this court on this question is fully discussed, supported by many authorities, in the case of Mays v. State, supra; also in the case of Scribner v. State, 9 Okla. Cr. 465, 132 Pac. 933, Ann. Cas. 1915B, 381. See, also, Bouvier's Law Dictionary, vol. 1, subject "Confessions."

Turner, the man who was robbed, testified that he could not identify the robbers, that he did not see their faces dis-

tinctly, but said that one of the defendants resembled one of the robbers in size and general appearance. He also testified in detail as to the manner of the robbery. The wives of the defendants testified that they were both at home that night and that they saw Turner and the Smith woman when they returned home at 3:30 that night, and defendants offered to show by these witnesses that Turner was so intoxicated that he could not have known just what did happen. This testimony was competent and should have been admitted. However, considered along with other evidence later introduced, the confessions of the defendants, and the recovery of the things stolen, the exclusion of this testimony was of little consequence. The defendants were undoubtedly guilty; otherwise how could they have produced the loot which they delivered to the county attorney?

Up to the time of this conviction these young men appear to have borne good reputations for being industrious, well-behaved citizens, and it appears that they may have been influenced to commit this offense by a wicked, designing woman. The punishment assessed is severe, but it is the minimum punishment prescribed by law for the offense of which the defendants were convicted, and we have no authority to mitigate it. That is a matter that may be urged in an application for executive clemency.

Notwithstanding the errors committed, this conviction must be affirmed under the provisions of what is known as our harmless error statute. Section 2822, Comp. St. 1921. The judgment of the trial court is accordingly affirmed.

MATSON, P. J., and DOYLE, J., concur.