## CARNELL FRY v. STATE.

No. A-10256.    April 5, 1944.

(147 P. 2d 803.)

300

Utterback & Utterback, of Durant, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and Bill Steger, Co. Atty., of Durant, for defendant in error.

BAREFOOT, J. Defendant, Carnell Fry, was charged in the district court of Bryan county with the crime of murder; was tried, convicted of manslaughter in the first degree, and sentenced to serve a term of 25 years in the penitentiary, and has appealed.

For a reversal of this case, it is contended:

"First: Failure of the court to give instructions requested by the defendant.

"Second: Error of the court in permitting the signed statement of the defendant to be introduced.

"Third: The verdict is not sustained by competent evidence."

With reference to the first assignment of error, it may be noted that defendant requested eight instructions. A

number of these requested instructions were given by the court, and it therefore is not necessary to consider them. In defendant's brief, reference is made to but three of the requested instructions.

Defendant's requested instruction No. 7 was as follows:

"The court instructs the jury that if the defendant is convicted of taking the life of Maggie Fry, then he could not receive or in any way share in the proceeds of any policy of insurance upon the life of the said Maggie Fry, but in that event the said proceeds of said insurance policies would be distributed to the heirs of the said Maggie Fry to the exclusion of the said defendant."

The state introduced in evidence certain insurance policies taken upon the life of deceased, and in favor of defendant, with the usual double indemnity clause in event of accidental death of insured. These policies were competent for the purpose of showing motive. There was also a clause in the policies which limited the payment if the life of the insured was taken by the beneficiary. The complaint is that the court refused the requested instruction, and did not instruct the jury with reference to this clause in the policy. No authority has been cited by defendant to sustain this contention.

We are of the opinion that the court did not err in refusing to give the above requested instruction. The question of "motive" in a homicide case as in other criminal cases, is a question of fact for the jury. Wharton on Homicide, pages 914-915-918; State v. Brown, 168 Mo. 449, 68 S. W. 568; Commonwealth v. Robinson, 146 Mass. 571, 16 N. E. 452; People v. Pope, 108 Mich. 361, 66 N. W. 213; Roe v. State, 25 Tex. App. 33, 8 S. W. 463; State v. Woodard, 132 Iowa, 675, 108 N. W. 753.

In Mitchie on Homicide, vol. 2, page 1447, it is said:

"Where the evidence tends to show a motive, an instruction based upon the hypothesis that there was no motive is properly refused."

And in Wharton, page 918:

"And the known existence of insurance payable to, or which might be realized upon by the accused, may be shown as indicating motive."

The policies of insurance were introduced in evidence. The terms of the policies were for the consideration of the jury. It was the contention of defendant that he had not killed the deceased, but that her death was an accident. He also entered a plea of self-defense. If the jury had found in his favor on either of these contentions, they would have acquitted him. If either of them had been upheld, under the terms of the insurance policies, he could have collected the face of the policies, including the double indemnity provided therein. He had the right to argue this proposition to the jury, as a question of fact, but for the jury to have been given the requested instruction would have been upon the weight of the evidence, which was a question exclusively for the consideration of the jury.

Instruction No. 25 given by the court was the same as requested instruction No. 3 offered by the defendant, with the exception that the court added the words: "and you do not believe from the evidence beyond a reasonable doubt that defendant was guilty of culpable negligence, according to the instructions herein given you." This entire instruction is based upon the weight of the evidence. It is most favorable to the defendant, and certainly the addition of the clause above quoted did not deprive him of any right.

The next instruction referred to by defendant is instruction No. 27. This instruction has reference to voluntary and involuntary statements made by the defendant. The court, after excusing the jury and out of their presence, heard the evidence with reference to the making of a statement by defendant while in the custody of the officers, and prior to his trial. After hearing the evidence and this statement, the court decided as a matter of law that it was a voluntary statement made by the defendant, and was therefore admissible. This is the procedure announced by this court as proper.

After deciding this matter, and admitting in evidence the statement made by defendant, the court then presented the matter to the jury (instruction No. 27), instructing them that if they found as a matter of fact the statement had been voluntarily made by defendant, they could consider the same; and if they did not find it was voluntarily made, they should disregard it. There is authority in this state upholding this procedure.

We are of the opinion at this time that this is a question of law to be passed upon by the court, and out of the presence of the jury, and that this responsibility should not be shifted by the court in order to let the jury pass upon the matter. The trial court should assume this responsibility, and after hearing the evidence, come to a conclusion as to whether or not, under the law, the statement was voluntary or involuntary. If it was voluntary, it may be admitted; if involuntary, it is inadmissible.

In the case of Lyons v. State, 77 Okla. Cr. 197, 138 P. 2d 143, the question of voluntary and involuntary confessions or statements was fully discussed, and many authorities cited and reviewed. It is unnecessary to again

quote them. This case has been appealed to the Supreme Court of the United States.

Instruction No. 27 was in the exact words of the instruction requested by defendant, except there was added thereto this additional clause· "and defendant must be warned that any statement made could be used against him in the trial, and that it was not necessary for him to make a statement unless he voluntarily desired to do so, and that he could have benefit of counsel if he so desired, but the fact that they may have been elicited by questions propounded to the defendant does not make them incompetent for your consideration. It is not necessary that such statements be spontaneous, that is, to proceed wholly from the suggestion of the defendant."

This last part of the instruction was favorable to the defendant, and more favorable than deserved. Defendant in his brief says:

"We are not urging that by adding to this instruction he took from it or so changed it as to render it harmful to defendant, but the error of the court occurred in admitting this written statement."

We may, therefore, consider the second and third assignments of error.

The defendant was charged with killing his wife, Maggie Fry, about three and a half miles south of Bennington, in Bryan county, on Monday, the 28th day of July, 1941. He was arrested on Thursday, the 31st day of July, 1941, and placed in the county jail of Bryan county about noon. On the hearing before the court at the time of the trial, defendant testified that he was arrested on Thursday evening, July 31, 1941, and that he made a statement to the officers on the next afternoon, August 1, 1941, in the county jail. He testified that he was taken from

the jail to the county attorney's office, and there was present at the time Bill Steger, the county attorney; Alan McPheron, the assistant county attorney; and three others, Bud Taylor, the sheriff of Bryan county and Cliff Kiersey, a deputy sheriff, and Bill Barker, a deputy United States Marshal. After making an oral statement to the officers on Friday, August 1st, the assistant county attorney was called in the afternoon and he made a written statement. It was introduced in evidence, and was as follows:

"Examination by Alan B. McPheron: Q. What is your full name? A. Tony Carnell Fry. Q. Mr. Fry, do you want to make a statement to us concerning your actions on the 28th day of July, 1941, the day that Maggie Lena May Fry met her death, with the understanding that the statement is to be voluntary on your part, and that you do not have to make the statement unless you want to, and that it is your constitutional right to refuse to make the statement, and that you may have counsel to advise you and that we are offering you no reward or immunity from prosecution in order to get you to make a statement? A. I am willing to make a statement under those conditions. Q. Just tell us when and what took place the first time you and your wife, Maggie Lena May Fry, left your house on Monday, July, 1941? A. We left the house just a little before sundown that day, and started east from my house to unload a load of posts I was going to use to fix a fence. After I unloaded the posts I drove back to the road and went by my potato patch and dug some potatoes, and then went to the Indian Church and turned around and started back to where I could get another load of posts. I stopped and loaded my wagon with posts, and then we started back towards the house. When we got to a corner of the fence at the creek I stopped and unloaded part of the posts; then Maggie and I drove on to the edge of the next bottom and stopped. I told Maggie that I was going to cut some weeds for the hogs, and she said, 'No, by God you aint, if theys any got them lazy boys are going to get 'em.' I went to get off the wagon, had one foot on the hound of the

wagon, and the other foot on the wheel and Maggie grabbed a short-handled hoe and hit at me; I dodged the lick and grabbed the hoe out of her hands and hit her one lick with the hoe; I think I hit her on the head; right after I hit Maggie the team started up and I ran up to catch them and stop them. Maggie had fallen off the seat down on the tongue and doubletree of the wagon; she fell off the tongue of the wagon between the horse on the right and the tongue of the wagon; I got the team stopped about ten or twelve steps from where Maggie fell to the ground; I went back to where Maggie was lying in the road and she braced herself up on her left arm and said something about someone trying to kill her, I couldn't understand exactly what she did say. I started to Mr. E. S. Mason's house for help and before I got past the wagon I stepped on the hoe that I hit her with; I picked the hoe up and carried it about 200 yards past the wagon and threw the hoe out into the weeds; I went by my house and called the kids but they were asleep, so I went on up to Mr. Mason's; just as I left my house one of the kids answered me and I told him that Maggie had fallen off the wagon and was hurt; I told Mr. Mason that Maggie had fallen off the wagon and was hurt, and I wanted him to go to Bennington and get the doctor. He told me he couldn't see very good but would get his son, Doss Mason, to drive up and get the doctor. Mrs. Mason went over to Doss' house and got Doss. Doss started to Bennington to get the doctor, but Doss came back in my brother's car with him, and said they couldn't get either doctor in Bennington, so I went with my brother to Bennington, and Othele Fry, my brother, called the ambulance at Durant to come and get my wife. Q. Mr. Fry, had you and your wife had any trouble that day before you hit her with the hoe? A. Yes, on that Monday morning she had been fussing at me all day about one thing and another. Q. Were you and Maggie married? A. No, we just started living together on July 3, 1937. I couldn't marry her because I didn't have a divorce from my second wife. Q. What was Maggie Lena May Fry's condition at the time you hit her with this hoe? A. She was pregnant, and expected to be confined about the 1st or 15th of September,

1941. Q. Mr. Fry, did you carry any insurance on your wife? A. Yes, I had a family policy that covered her and the rest of the family for $500. I had that policy since some time in 1938. Q. You have read this statement consisting of two pages and it is the statement you have made to me and it is the truth? A. Yes, sir. Signed: T. C. Fry. Subscribed and sworn to before me this the 1st day of August, 1941. W. S. Gardner, Notary Public.

"My comm. ex. May 22-1942."

After this statement was made, defendant went with the officers to the scene of the crime and there located and found the hoe with which he said he had struck his wife, on a hill-side about 200 yards from where her body was found.

Prior to making this statement, the defendant on the night of the killing of the deceased had told witnesses and the officers that his wife had been accidentally killed by falling from the wagon, and that at the time she fell he was 60 yards from the wagon, cutting weeds for his hogs, and that when he returned to the wagon he found his wife, and that he went by his home and informed his children that his wife had been killed accidentally and he hurried to the residence of E. S. Mason, a neighbor, some distance away, and asked him to go for a doctor. They could not secure a doctor in Bennington, and an ambulance came from Durant and took the body of his wife to Durant. She died before reaching the hospital. This same story was told by the defendant after his arrest on Thursday, July 31, 1941, and was not deviated from until Friday, August 1, 1941, when he changed his story and told the officers that he had struck his wife with the hoe, as revealed by the statement heretofore quoted.

We realize that the question of how far officers may go in this state toward questioning a defendant prior to

the filing of charges, or taking him before a magistrate, is not only a delicate question, but has now become one of major importance in this state. Of late we have referred to this matter in cases hereafter cited. The Supreme Court of the United States, in a very recent case, had this question under consideration, as applied to violations of the federal statutes. In the case of McNabb et al. v. United States, 318 U. S. 332, 63 S. Ct. 608, 613, 87 L. Ed. 819, the court had before it the question of confessions made by six defendants who were arrested by F. B. I. officers and held in the custody of state officers for a period of six days. They were, after written statements had been obtained from them, charged with the violation of a federal statute, and the written statements were introduced in evidence against them. These defendants were at no time taken before a committing magistrate, nor were they permitted to talk with friends or relatives or to have the opportunity to consult an attorney prior to the taking of the written statements. They were continuously questioned by the federal officers during the time above stated. The Supreme Court held that the written statements were not admissible, using the following language:

"Quite apart from the Constitution, therefore, we are constrained to hold that the evidence elicited from the petitioners in the circumstances disclosed here must be excluded. For in their treatment of the petitioners the arresting officers assumed functions which Congress has explicitly denied them. They subjected the accused to the pressures of a procedure which is wholly incompatible with the vital but very restricted duties of the investigating and arresting officers of the Government and which tends to undermine the integrity of the criminal proceeding. Congress has explicitly commanded that 'It shall be the duty of the marshal, his deputy, or other officer, who may arrest a person charged with any crime or offense, to take the defendant before the nearest United

States commissioner or the nearest judicial officer having jurisdiction under existing laws for a hearing, commitment, or taking bail for trial * * *.' * * * 18 U. S. C. A. 595. Similarly, the Act of June 18 1934, c. 595, 48 Stat. 1008, * * * 5 U. S. C. A. 300a, authorizing officers of the Federal Bureau of Investigation to make arrests, requires that 'the person arrested shall be immediately taken before a committing officer.' Compare also the Act of March 1, 1879, c. 125, 20 Stat. 327, 341, * * * 18 U. S. C. A. 593, which provides that when arrests are made of persons in the act of operating an illicit distillery, the arrested persons shall be taken forthwith before some judicial officer residing in the county where the arrests were made, or if none, in the county nearest to the place of arrest. Similar legislation, requiring that arrested persons be promptly taken before a committing authority, appears on the statute books of nearly all the states.

"The purpose of this impressively pervasive requirement of criminal procedure is plain. A democratic society, in which respect for the dignity of all men is central, naturally guards against the misuse of the law enforcement process. Zeal in tracking down crime is not in itself an assurance of soberness of judgment. Disinterestedness in law enforcement does not alone prevent desregard of cherished liberties. Experience has therefore counseled that safeguards must be provided against the dangers of the overzealous as well as the despotic. The lawful instruments of the criminal law cannot be entrusted to a single functionary. The complicated process of criminal justice is therefore divided into different parts, responsibility for which is separately vested in the various participants upon whom the criminal law relies for its vindication. Legislation such as this, requiring that the police must with reasonable promptness show legal cause for detaining arrested persons, constitutes an important safeguard—not only in assuring protection for the innocent but also in securing conviction of the guilty by methods that commend themselves to a progressive and self-confident society. For this procedural requirement checks

resort to those reprehensible practices known as the 'third degree' which, though universally rejected as indefensible, still find their way into use. It aims to avoid all the evil implications of secret interrogation of persons accused of crime. It reflects not a sentimental but a sturdy view of law enforcement. It outlaws easy but self-defeating ways in which brutality is substituted for brains as an instrument of crime detection. A statute carrying such purposes is expressive of a general legislative policy to which courts should not be heedless when appropriate situations call for its application.

"The circumstances in which the statements admitted in evidence against the petitioners were secured reveal a plain disregard of the duty enjoined by Congress upon federal law officers. Freeman and Raymond McNabb were arrested in the middle of the night at their home. Instead of being brought before a United States Commissioner or a judicial officer, as the law requires, in order to determine the sufficiency of the justification for their detention, they were put in a barren cell and kept there for fourteen hours. For two days they were subjected to unremitting questioning by numerous officers. Benjamin's confession was secured by detaining him unlawfully and questioning him continuously for five or six hours. The McNabbs had to submit to all this without the aid of friends or the benefit of counsel. The record leaves no room for doubt that the questioning of the petitioners took place while they were in the custody of the arresting officers and before any order of commitment was made. Plainly, a conviction resting on evidence secured through such a flagrant disregard of the procedure which Congress has commanded cannot be allowed to stand without making the courts themselves accomplices in wilful disobedience of law. Congress has not explicitly forbidden the use of evidence so procured. But to permit such evidence to be made the basis of a conviction in the federal courts would stultify the policy which Congress has enacted into law.

"Unlike England, where the Judges of the king's bench have prescribed rules for the interrogation of prisoners while in the custody of police officers, we have no specific

provisions of law governing federal law enforcement officers in procuring evidence from persons held in custody. But the absence of specific restraints going beyond the legislation to which we have referred does not imply that the circumstances under which evidence was secured are irrevelant in ascertaining its admissibility. The mere fact that a confession was made while in the custody of the police does not render it inadmissible. Compare Hopt v. Utah, 110 U. S. 574, 4 S. Ct. 202, 28 L. Ed. 262; Sparf v. United States, 156 U. S. 51, 66, 15 S. Ct. 273, 39 L. Ed. 343 [345]; United States ex rel. Bilokumsky v. Tod, 263 U. S. 149, 157, 44 S. Ct. 54, 57, 68 L. Ed. 221 [225]; Ziang Sun Wan v. United States, 266 U. S. 1, 14, 45 S. Ct. 1, 3, 69 L. Ed. 131, 148. But where in the course of a criminal trial in the Federal courts it appears that evidence has been obtained in such violation of legal rights as this case discloses, it is the duty of the trial court to entertain a motion for the exclusion of such evidence and to hold a hearing, as was done here, to determine whether such motion should be granted or denied. Cf. Gouled v. United States, 255 U. S. 298, 312, 313, 41 S. Ct. 261, 65 L. Ed. 647 [653, 654]; Amos v. United States, 255 U. S. 313, 41 S. Ct. 266, 65 L. Ed. 654; Nardone v. United States, 308 U. S. 338, 341, 342, 60 S. Ct. 266, 84 L. Ed. 307 [311, 312]. The interruption of the trial for this purpose should be no longer than is required for a competent determination of the substantiality of the motion. As was observed in the Nardone case (U. S.), supra, 'The civilized conduct of criminal trials cannot be confined within mechanical rules. It necessarily demands the authority of limited direction entrusted to the judge presiding in federal trials, including a well-established range of judicial discretion, subject to appropriate review on appeal in ruling on preliminary questions of fact. Such a system as ours must, within the limits here indicated, rely on the learning, good sense, fairness and courage of federal trial judges.' 308 U. S. at page 342, 60 S. Ct. at page 268, 84 L. Ed. 307.

"In holding that the petitioners' admissions were improperly received in evidence against them, and that having been based on this evidence their convictions can-

not stand we confine ourselves to our limited function as the court of ultimate review of the standards formulated and applied by federal courts in the trial of criminal cases. We are not concerned with law enforcement practices except in so far as courts themselves become instruments of law enforcement. We hold only that a decent regard for the duty of courts as agencies of justice and custodians of liberty forbids that men should be convicted upon evidence secured under the circumstances revealed here. In so doing, we respect the policy which underlies Congressional legislation. The history of liberty has largely been the history of observance of procedural safeguards. And the effective administration of criminal justice hardly requires disregard of fair procedures imposed by law.

"Reversed."

It will be noted that the Supreme Court holds that federal officers cannot question persons arrested, under the conditions as they existed in the instant case, and take from them written statements which can be introduced in evidence against them.

But this court has uniformly held that the taking of statements and confessions made by defendants were admissible in evidence, if they were voluntarily made. Kirk v. Territory, 10 Okla. 46, 60 P. 797; Berry v. State, 4 Okla. Cr. 202, 111 P. 676, 31 L. R. A., N. S., 849; Simonson v. State, 33 Okla. Cr. 113, 242 P. 279; Howington v. State, 35 Okla. Cr. 352, 250 P. 941; Williams v. State, 38 Okla. Cr. 1, 258 P. 1066; Edwards v. State, 46 Okla. Cr. 77, 288 P. 359; Wood v. State, 72 Okla. Cr. 364, 116 P. 2d 728; Lucas v. State, 26 Okla. Cr. 23, 221 P. 798. And that they could be made to peace officers while under arrest. Anderson v. State, 8 Okla. Cr. 90, 126 P. 840, Ann. Cas. 1914C, 314; Mays v. State, 19 Okla. Cr. 102, 197 P. 1064; Williams v. State, 65 Okla. Cr. 336, 86 P. 2d 1015; Cooper v. State, 31 Okla. Cr. 165, 237 P. 865.

The Supreme Court of the United States, in the case of Hebert v. Louisiana, 272 U. S. 312, 47 S. Ct. 103, 104, 71 L. Ed. 270, 48 A. L. R. 1102, cited in the McNabb case, says:

"Whether state statutes shall be construed one way or another is a state question, the final decision of which rests with the courts of the state. The due process of law clause in the Fourteenth Amendment does not take up the statutes of the several states and make them the test of what it requires; nor does it enable this court to revise the decisions of the state courts on questions of state law. What it does require is that state action, whether through one agency or another, shall be consistent with the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions and not infrequently are designated as 'law of the land.' Those principles are applicable alike in all the states, and do not depend upon or vary with local legislation. Castillo v. M'Connico, 168 U. S. 674, 682, 683, 18 S. Ct. 229, 42 L. Ed. 622 [624, 625]; West v. Louisiana, 194 U. S. 258, 261, 263, 24 S. Ct. 650, 48 L. Ed. 965 [968, 969]; Patterson v. Colorado, 205 U. S. 454, 459, 27 S. Ct. 556, 51 L. Ed. 879 [880], 10 Ann. Cas. 689; Pullman Co. v. Knott, 235 U. S. 23, 25, 35 S. Ct. 2, 59 L. Ed. 105 [110]; Enterprise Irrig. Dist. v. Farmers' Mut. Canal Co., 243 U. S. 157, 166, 37 S. Ct. 318, 61 L. Ed. 644 [649]. The Supreme Court of the state having held that the two statutes must be taken together in determining the penalty intended, we must accept that conclusion as if written into the statutes themselves. Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 73, 31 S. Ct. 337, 55 L. Ed. 369 [375], Ann. Cas. 1912C, 160. All that would be open in this court under the due process clause is whether the state had power to impose the penalty fixed by the statutes as thus construed. Rawlins v. Georgia, 201 U. S. 638, 640, 26 S. Ct. 560, 50 L. Ed. 899 [900], 5 Ann. Cas. 783. That the state had such power is not questioned, but only that the statutes rightly construed show that the power has been exercised. On this

question, as we have said, the decision of the Supreme Court of the state is controlling."

It has been the established practice in this court in the early cases for the question of whether a confession is voluntary or involuntary to be submitted to the jury. The cases heretofore cited fully state this rule. But in the later cases we have urged upon the district judges the duty and responsibility of first deciding this question as a question of law, and this question should not be submitted to the jury because there is mere conflict in the evidence, but the court should judicially determine in his own mind whether the facts justify as a matter of law its submission. If the court decides that it is a voluntary statement and admits it, we do not see that the defendant can complain that the issue is then submitted to the jury as a question of fact. It gives the jury the right to pass upon it as applied to the facts, but the appellate courts pass upon the question as a matter of law, and if they determine that the statement is involuntary under the law, they have the right to so hold.

This principle is well illustrated in the Lyons Case, supra. In that case the court rightfully held that the first confession was involuntarily made and under the law was inadmissible. In the instant case there is no evidence that any cruel or unusual punishment was administered to the defendant, or that any threat, or promise of immunity that would cause the defendant to be likely to tell an untruth from the fear of the threat, or hope of profit from the promise. The only irregularity was the holding of the defendant in custody, the questioning of him by the officers, and the taking of the written statement prior to the filing of charges, and at a time when he had not been given an opportunity to consult with an attorney, and to see his friends or relatives.

There can be no question but that too many citizens of this state are being arrested, and confined in the jails and penitentiary of this state for an unusual period of time without being taken before a magistrate as provided by law, and without being given the opportunity of consulting with their relatives, or to have an attorney to represent them, and they are held in custody, and questioned continually and in some instances force and unusual punishment is inflicted to secure from them a confession. The ferreting out of crime is to be commended. But it should be done in the manner provided by law. The statutes of our state provide:

"The defendant must, in all cases, be taken before the magistrate without unnecessary delay." 22 O. S. A. 1941 § 181.

"When the defendant is brought before a magistrate upon an arrest, either with or without a warrant, on a charge of having committed a public offense, the magistrate must immediately inform him of the charge against him, and of his right to the aid of counsel in every stage of the proceedings, and also of his right to waive an examination before any further proceedings are had." 22 O. S. A. 1941 § 251.

In the case of Smith v. State, 77 Okla. Cr. 142, 140 P. 2d 237, 238, a statement was made under facts very similar to those here presented. The trial court admitted the statement as having been voluntarily made, and this was upheld. In the opinion we stated:

"In the Lyons Case, above referred to, we said: 'There are very few instances when all the facts are taken together but will show one's guilt, if he is guilty, and it is not necessary that a confession be obtained in every case to the end that the guilty party may be properly brought to justice. The facts in the instant case clearly demonstrate this.'

"As there stated, it is not always necessary to secure a confession in order to secure a conviction. The facts in this case emphasize this point even better than does the Lyons case. Here the state had two eyewitnesses to the homicide, and other evidence sufficient to connect the defendant therewith. While we think the statement made by the defendant is clearly voluntary and admissible in evidence under the law, yet we again call the attention of county officers to the fact that it is not always necessary that a confession be had to the end that persons may be successfully prosecuted, and they should be doubly careful that defendants who are in their custody are not mistreated and that by reason of such mistreatment statements or confessions are taken from them which are wholly involuntary and under the law cannot be introduced in evidence. By this statement we are not assuming that this defendant was in any way mistreated. The deputy sheriff whom the defendant testified struck him with his gun was present in the court room at the time of the trial. Defendant had subpoenaed him as a witness, but did not place him on the stand."

From what has been noted in the McNabb case, it is readily seen that the federal courts, and especially the Supreme Court of the United States, have condemned these practices as they apply to federal cases, and have not hesitated to apply them to state statutes where the 14th Amendment to the Constitution of the United States has been violated. Brown v. Mississippi, 297 U. S. 278, 56 S. Ct. 461, 80 L. Ed. 682; Chambers v. Florida, 309 U. S. 227, 60 S. Ct. 472, 84 L. Ed. 716; Canty v. Alabama. 309 U. S. 629, 60 S. Ct. 612, 84 L. Ed. 988; Vernon v. Alabama, 313 U. S. 540, 61 S. Ct. 833, 85 L. Ed. 1509; White v. Texas, 310 U. S. 530, 60 S. Ct. 1032, 84 L. Ed. 1342.

In the case of Pressley v. State, 71 Okla. Cr. 436, 112 P. 2d 809, we announced the rule that has been followed in this state with reference to the admission of voluntary and involuntary statements. It is there stated:

"Where the competency of a confession is challenged on the ground that, if made, it was not voluntary, its admissibility is primarily a question for the court. In the absence of the jury the court should hear the evidence offered respecting the facts and circumstances attending such alleged confession, and the burden is on the defendant to show that it was procured by such means or under such circumstances as to render it inadmissible, unless the evidence on the part of the state tends to show that fact. If it is held competent, and proof of the same admissible, the defendant is entitled to have the evidence in regard to the facts and circumstances under which it was made given anew to the jury, not that the jury may pass upon its competency or admissibility, but for the purpose of enabling them to judge what weight and value should be given to it as evidence, and the jury may disregard it if they are not satisfied that it was voluntarily made."

Applying the law to the facts in the instant case, we find that defendant, both at the preliminary and at the final trial, was represented by able counsel. After the written statement made by defendant had been introduced in evidence, defendant took the witness stand in his own behalf, and related to the jury his testimony as to the circumstances under which the statement was made. After testifying to his arrest on Thursday, July 31, 1941, and being brought to the Bryan county jail about 1:30 p. m., he was taken to the office of the county attorney, where he was confronted by the persons above stated, that he was questioned until about 6 p. m., and was then taken to the city jail in Durant, and held for a period of several hours, and then returned to the county jail. That he was again questioned in the jury room of the courthouse until 9:30 or 10 p. m. That on the morning of the following day, Friday, August 1, 1941, he was again questioned by various officers above named. He claimed that he was told by the sheriff of Bryan county that if he would tell them he

killed his wife, that would settle the matter up and he would take him home to see the children, and that this was the inducement which caused him to sign the statement. He also testified to numerous statements made by Bill Barker, the deputy United States Marshal, and officer C. D. Robinett of Sherman, Tex., whom the sheriff of Bryan county had sent for.

It will be noted that the written statement made by defendant, while contradictory to the statements previously made by him to the officers and others with reference to his hitting his wife with a hoe, also attempted to justify his action, and also attempted to show that her injury was caused by the fall, and possibly by the wagon passing over her head or body. Of course, the defendant received the benefit of this part of the statement. He also testified that he was never asked if he wanted an attorney to represent him.

In rebuttal the state offered the testimony of all the witnesses above named, and they each denied the statements made by defendant with reference to what they said, the sheriff specifically denying that he promised to take the defendant home if he would make the statement, and Mr. Barker that he advised him to plead guilty.

Alan McPheron, assistant county attorney, denied that any promise or inducement of any kind was made the defendant, or that any force or unusual treatment was accorded him. We also have in evidence the preliminary part of the statement, as follows:

"Mr. Fry, do you want to make a statement to us concerning your actions on the 28th day of July, 1941, the day that Maggie Lena May Fry met her death, with the understanding that the statement is to be voluntary on your part, and that you do not have to make the statement unless you want to, and that it is your constitutional

right to refuse to make the statement, and that you may have counsel to advise you and that we are offering you no reward or immunity from prosecution in order to get you to make a statement?"

The defendant denied that this was attached to the statement when he signed it, but of this there can be little doubt. The assistant county attorney testified that the statement was read to him and he voluntarily signed it. The court, after hearing this evidence out of the hearing of the jury, decided the statement was voluntarily made and admitted it in evidence. Under the former decisions of this court, we cannot say that it was error to admit the statement in evidence. As above indicated, we again caution officers of this state to give to every person whom they arrest the rights which the laws of this state and the Constitution give them. By this we do not mean to say that this defendant was denied those rights at the time he made the statement in this case.

It is revealed by the record that the deceased was left at the scene for a number of hours before the ambulance arrived. Defendant testified that he immediately left the scene and went to his home and informed his sons of the occurrence; that he then went to the home of Mr. Mason, a neighbor, and Mr. Mason's son went to Bennington, a distance of three and a half miles to get a doctor. He returned without a doctor, and defendant and his brother then went back to Bennington, and when they could not get a doctor, telephoned to Durant for an ambulance. The ambulance went from Durant to Bennington, and then to the scene, and took deceased to Durant. In all probability, had the deceased had prompt medical attention, she would not have died from the injuries inflicted. Taking this fact, the age of defendant, his education and the facts hereinbefore set forth into consideration,

we have decided that justice demands that the judgment and sentence of 25 years in the penitentiary assessed in this case should be modified to 15 years in the penitentiary.

As so modified, the judgment and sentence of the district court of Bryan county is affirmed.

JONES, P. J., concurs. DOYLE, J., not participating.